**In re CHAS. P. YOUNG COMPANY, et al., Debtors.**

**Bankruptcy No. 89 B 11879.**

United States Bankruptcy Court, S.D. New York.

March 6, 1990.

Kelley, Drye & Warren, New York City, for debtors; Sandra E. Mayerson and Joseph E. Sarachek, of counsel.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for Typographical Union No. 6; Daniel Engelstein, of counsel.

Platzer, Fineberg & Swergold, New York City, for Creditors' Committee; Sydney Platzer, of counsel.

Oppenheimer, Wolff & Donnelly, New York City, for Chas. P. Young (N.Y.); Christopher W. Jones, and Joseph Vicinanza, of counsel.

## DECISION CONCERNING DEBTOR'S MOTION TO BE RELIEVED FROM ARBITRATION

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

The debtor, Charles P. Young Company New York, Inc. ("CPYNY"), seeks to be permanently relieved from an interest arbitration clause contained in its collective bargaining agreement with New York Typographical Union No. 6 ("Local 6"). The following are the facts giving rise to this motion.

*Facts*

In 1975, the Printers League Section of the Association of Graphic Arts, Inc. (the "Printers League"), a multi-employer association that has represented financial and commercial printers in New York, including CPYNY, entered into a collective bargaining agreement with Local 6 (the "Contract").

The Contract under which CPYNY is operating expired on October 3, 1989. The Contract was amended in 1983, and as part of the amendment, the term of the Contract was extended for three two-year periods to October 3, 1989. Part II of the amended Contract, entitled "Duration of Contract and Negotiating Procedure", provides that "[t]his Contract shall be in effect for a period beginning with the day shift on October 4, 1975 to an including October 3, 1975 to and including October 3, 1989." Contract at 15 (Exhibit F Debtor's Application for Interim Relief). Part II provides that "[t]he parties expressly agree that during the term of this Contract, it is not their intent to negotiate over the subject of extending the term thereof beyond October 3, 1989." Contract at 16.

Part II also sets forth various "options" which may be exercised by Local 6 during the term of the Contract. Union Option B of the Contract provides that the Union may submit to interest arbitration any unresolved proposals regarding Contract enhancements. Union Option B of the Contract provides, in pertinent part:

Union Option B (Arbitration): The Union may elect to notify the League that it will submit to arbitration any unresolved proposals for Contract improvements, including proposals for wage increases larger than those provided by this Contract. This option may be exercised in connection with Contract amendments to be effective October 5, 1985, 1987 or 1989....

The parties shall agree which specified issues have been settled through collective bargaining and which specified issues are to be submitted to arbitration....

The decision should be rendered by October 3.... If no decision can be rendered by that date, a decision shall be rendered expeditiously and all wage increases shall be fully retroactive and all Contract improvements to the extent practicable shall be retroactive to the beginning of the day shift on October 4....

Decisions of the arbitration panel shall be final and binding on both parties.

The League under this option shall not seek to reduce wages, the cost of living formula or other benefits or terms and conditions under this Contract or Special Agreement. However, the panel shall consider the costs of such items in rendering its decisions on the issues presented to it....

Contract at 16–18.

Arbitration under Union Option B is to be conducted before a panel of three arbitrators "designated by agreement of the parties." *Id.* at 16. If the parties cannot agree on a panel, the panel is to be selected under the Voluntary Labor Arbitration Rules of the American Arbitration Association. *Id.* at 16–17. Under the terms of Union Option B, the decision of the arbitration panel should be rendered by October 3, but if not, as expeditiously as possible. If the decision is rendered subsequent to October 3, all wage increases shall be fully retroactive, and all Contract improvements, to the extent practicable, shall be retroactive to the beginning of the day shift on October 4. *Id.*

On April 26, 1989, representatives of CPYNY and Local 6 formally met to negotiate a new collective bargaining agreement between CPYNY and Local 6. The parties failed to reach a new collective bargaining agreement at that meeting. Since that time proposals for a new collective bargaining agreement have been made by the parties and additional meetings have taken place but to date a new collective bargaining agreement has not been reached. Throughout this time, Local 6 has contin-

ued to assert its belief that it can get enhancements on unresolved items through interest arbitration. By letter dated June 15, 1989, Local 6 informed CPYNY that it was "invoking Union Option B," and enclosed a letter addressed to the Printers League's president notifying him that Local 6 was exercising its "option" to submit to arbitration unresolved proposals for Contract improvements, including proposals for wage increases. (Exhibit D–6 to Debtor's Application for Interim Relief).

On July 31, 1989, CPYNY filed its petition pursuant to Chapter 11 of the Bankruptcy Code. On September 26, 1989, United States District Court Judge John M. Walker issued a Decision and Order in *New York Typographical Union No. 6 v. Printers League Section of the Association of Graphic Arts*, No. 89 Civ. 4839, 1989 WL 116358 (S.D.N.Y. Sept. 26, 1989), in which he held that the fifty employers that were bound by the collective bargaining agreement between Local 6 and the League were also bound by Union Option B of the Contract. *Id.*, slip op. at 11. In reaching this decision, Judge Walker also held that interest arbitration was "available for proposals bearing on terms that became or remain effective after expiration ... includ[ing], but [are] not limited to, proposals affecting the ongoing income protection provisions," which also survived the collective bargaining agreements stated expiration date.[1] *Id.*, slip op. at 10.

Pursuant to a motion by CPYNY and after notice and a hearing before this Court, on September 27, 1989, this Court ordered interim relief from the Contract for a period of sixty (60) days and set a briefing schedule on CPYNY's motion for declaratory relief that the interest arbitration provision is inapplicable in bankruptcy. The interim relief was extended another sixty (60) days by this Court.

Local 6 has put forth basically the following three (3) arguments in opposition to the relief requested by CPYNY:

---

**1.** In a Supplemental Memorandum and Order, No. 89 Civ. 4839 (JMW) (S.D.N.Y. Jan. 24, 1990), 1990 WL 42551, Judge Walker clarified the scope of his earlier order. Judge Walker held that "[p]roposals concerning wages, hours and benefits, however, are not subject to resolution through Union Option B" but that "proposals that affect the income guarantees and discharge reinstatement provisions" are issues subject to interest arbitration. *Id.* slip op. at 6–7.

(1) That CPYNY must first file for rejection of the collective bargaining agreement under § 1113(f) of the Code;

(2) That Judge Walker's decision mandates that the interest arbitration proceedings go forward against CPY-NY;

(3) That the interest arbitration proceedings do not fall within the parameters of the automatic stay.

Union's Memorandum in Opposition at 10–17.

## I

■ Local 6 claims that in order to be permanently relieved from Union Option B, CPYNY must first reject the Contract pursuant to § 1113(b) & (c) of the Code. Since the debtor has not moved to reject, Local 6 reasons that this Court, because of § 1113(f), lacks the power to modify the Contract and permanently relieve CPYNY from Union Option B. Section 1113(f) provides the following:

> No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

11 U.S.C. § 1113(f).

Section 1113(f), in speaking of rejection or modification of the provisions of a collective bargaining agreement, incorporates an underlying assumption that there is an existing collective bargaining Contract to reject or modify. In the instant case, however, the Contract expired by its own terms on October 3, 1989. In his decision, Judge Walker clearly stated that the interest arbitration clause does not change the fact that the expiration date of the collective bargaining agreement is October 3, 1989. *New York Typographical Union No. 6 v. Printers League Section of the Association of Graphic Arts*, No. 89 Civ. 4839, slip. op. at 9 (S.D.N.Y. Sept. 26, 1989). The Contract provides that:

> The parties expressly agree that during the term of this Contract, it is not their intention to negotiate over the subject of

extending the terms thereof beyond October 3, 1989.

Contract at 16.

Rejection of a collective bargaining agreement pursuant to § 1113(b) and (c) is a moot issue if the agreement expires by its own terms and before the bankruptcy court has a hearing on rejection. *Gloria Mfg. Corp. v. International Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir.1984) ("Once a contract has expired on its own terms, there is nothing left for the trustee to reject or assume"); *In re Pesce Baking Co.*, 43 B.R. 949, 957 (Bankr. N.D.Ohio 1984) ("Although a collective bargaining agreement may be executory on the date the debtor's bankruptcy petition is filed, once the agreement expires of its own terms, the debtor's application to reject it becomes moot.")

Since the Contract, in the instant case, expired by its own terms on October 3, 1989, rejection is a moot issue and therefore a hearing on rejection is not a prerequisite to making a determination on CPYNY's motion seeking relief from Union Option B.

## II

Having determined that a rejection of the Contract is not necessary, since it expired by its own terms on October 3, 1989, a question arises as to the continued enforceability of the interim changes authorized by this Court where the order authorizing interim relief, pursuant to § 1113(e), was entered prior to the termination of the contract but extended past the termination date. In addressing this issue a brief overview of § 1113 and its history is helpful.

Section 1113 was Congress' response to the Supreme Court case *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which held that a collective bargaining agreement was an executory contract and subject to unilateral rejection by a debtor-in-possession pursuant to § 365(a) of the Code. The *Bildisco* decision placed federal bankruptcy policy and national labor policy in direct conflict.

Under the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–69 (1982), an employer is prohibited from unilaterally modifying a collective bargaining agreement during the life of the contract.[2] Pursuant to *Bildisco*, the debtor could ignore national labor policy and make unilateral changes to or reject entirely a collective bargaining agreement. Under § 1113 a debtor in possession or trustee is required to, *inter alia*, pursue some sort of good faith negotiations with the union prior to filing with the court for rejection of the collective bargaining agreement.[3] At first blush it may appear that Congress intended to incorporate the good faith bargaining requirement imposed by the NLRA with the policies underlying the Code and specifically § 1113. This contention, however, has been refuted by the legislative history of § 1113.[4]

In any event, it is apparent that both the Supreme Court, in *Bildisco*, and Congress derived the debtor's power to alter or terminate a collective bargaining agreement from overall bankruptcy policy and law rather than from labor law.

■ Unfortunately, § 1113 only contemplates the rejection or modification of a collective bargaining agreement or the granting by the court to a debtor interim relief from the terms of the collective bargaining agreement.[5] It does not provide for the situation this Court is faced with, namely where interim relief is granted and the relief period extends past the expiration date of the collective bargaining agreement. Pursuant to labor law and policy, an employer can implement unilateral changes to an expired collective bargaining agreement only after that employer has bargained to an impasse. *Producers Dairy Delivery Co., Inc. v. Western Conference of Teamsters Pension Trust Fund*, 654 F.2d 625 (9th Cir.1981); *Hinson v. NLRB*, 428 F.2d 133 (8th Cir.1970). *See also*

---

**2.** 29 U.S.C. § 158(d) (1982). Section 8(d) provides, in part:

*Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that *no party to such contract shall terminate or modify such contract,* unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) *continues in full force and effect,* without resorting to strike or lock-out, *all the terms and conditions of the existing contract* for a period of sixty days after such notice is given or *until the expiration date of such contract,* whichever occurs later;

... the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. *Id.* (emphasis added). The effect of this provision is to prohibit any mid-term modification or termination of a contract for a fixed term except with both parties' agreement.

**3.** Section 1113(b)(2) provides:

(2) During the period beginning on the date of the making of a proposal ... and ending on the date of the hearing ..., the trustee shall meet, at reasonable times, with the authorized representative to confer in *good faith* in attempting to reach mutually satisfactory modifications of such agreement. (emphasis added)

**4.** Senator Thurmond stated that the "good cause" language found in § 1113 "is obviously not intended to import traditional labor law concepts into a bankruptcy forum or turn the bankruptcy courts into a version of The National Labor Relations Board." 130 Cong.Rec. S 8888 (daily ed. June 29, 1984) (statement of Sen. Thurmond). *See also,* Haggard, The Continuing Conflict Between Bankruptcy and Labor Law, 1 B.Y.U.L.R. 1 (1986) ("[L]egislative history, such as it is, suggests that the intent was merely to codify the limited *Bildisco* requirement, not to require bankruptcy courts to enforce NLRA collective bargaining duties." (footnotes omitted).

**5.** 11 U.S.C. § 1113(e) sets forth the criteria a court must consider in granting relief.

*NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

■ First at issue is whether the bankruptcy court's order allowing interim relief stays in effect after the Contract expires. Secondly, if the court's order does stay in effect, a question arises as to whether the bankruptcy court can extend the time period in which the interim relief is effective. There is little case law on these issues although a few commentators have considered them.[6]

The bankruptcy court in *In re D.O. & W Coal Co.*, 93 B.R. 454 (Bankr.W.D.Va.1988) was confronted with the similar issue: "Whether orders issued by the court modifying the collective bargaining agreement remain in effect after the agreement has expired." *Id.* at 455. In that case the bankruptcy court granted the debtor interim relief from its collective bargaining agreement pursuant to § 1113(e) but prior to the expiration of the interim relief period, the agreement expired by its own terms. The debtor, after the expiration of the collective bargaining agreement and after unsuccessfully moving for further relief, stopped complying with the terms of the order granting interim relief. The court, holding that the modifications remained in effect, reasoned that "[t]o accede to the debtors' position and terminate the court's previous orders would not only violate debtor's duty to maintain the terms and conditions of the expired agreement during negotiations but would also be counter-productive to debtor's reorganization." *Id.* at 456. This Court agrees wholeheartedly with the court in *D.O. & W Coal Co.* This is another area where bankruptcy policy should override labor policy. If the order authorizing interim relief becomes ineffective once the agreement terminates by its own terms, it seems that

pursuant to labor law the debtor is required to return to the terms of the original agreement until bargaining to an impasse occurs.[7] Since any interim relief allowed must be "essential to the continuation of the debtor's business, or in order to avoid irreparable damages to the estate ...", 11 U.S.C. § 1113(e), a return to the original terms of the agreement may very well prove to be detrimental to any possibility of the debtor's successful reorganization. The court in *In re Wheeling–Pittsburgh Steel Corp.*, 50 B.R. 969 (Bankr.W. D.Pa.), *vacated on other grounds*, 791 F.2d 1074 (3rd Cir.1986) observed, in the context of a motion to reject under § 1113(b) & (c):

> The paramount goal in a Chapter 11 proceeding is reorganization of the company, not preservation of the collective bargaining agreement. Understandably, the union desires to emerge from this proceeding having preserved the terms and conditions of the collective bargaining agreement. However, if by doing so, the company is pushed into liquidation, the union's victory will have been a Pyrrhic one. '[C]ontracts with a liquidated company offer hollow promises.'

*Id.* at 978.

The result of deeming the order granting interim relief invalid, as of the expiration date of the Contract, could certainly not enure to the benefit of either CPYNY or Local 6. Accordingly, in the instant case, the order issued by this Court authorizing interim relief from the Contract remained in effect despite the expiration of the Contract. Furthermore, for the reasons as set forth above, the bankruptcy court can, post-expiration of the collective bargaining agreement, extend the interim relief period.

### III

■ The crux of the controversy at hand is whether or not the CPYNY is bound by

---

6. Haggard, The Continuing Conflict Between Bankruptcy and Labor Law, 1 B.Y.U.L.R. 1 (1986); West, Life after *Bildisco:* Section 1113 and the Duty to Bargain in Good Faith, 47 Ohio State L.J. 65 (1986).

7. One commentator suggests that if negotiations occurred during the period in which interim relief is in place, the debtor may be "in a position to implement its last offer and reduce

wages and benefits upon expiration of the contract...." West, Life After Bildisco: Section 1113 and the Duty to Bargain in Good Faith, 47 Ohio State L.J. 65, 151, footnote 363 (1986). This Court does not determine herein whether the negotiations between CPYNY and Local 6, during the period in which interim relief has been in place, constitutes bargaining to an impasse.

Union Option B in the Agreement. The debtor seeks to be permanently relieved from interest arbitration claiming that not only does interest arbitration run afoul of the entire scheme of the Code but that the very existence of this debtor will be seriously jeopardized if it is required to participate in such arbitration proceedings. Debtor's Memorandum of Law in Support. Local 6, on the other hand, claims, *inter alia*, that the debtor is bound by interest arbitration clause because of Judge Walker's decision in *New York Typographical Union No. 6 v. Printers League Section of the Association of Graphic Arts*, 89 Civ. 4839 (S.D.N.Y. Sept. 26, 1989). Union's Memorandum in Opposition at 10.

The debtor correctly points out that Local 6 is essentially applying the doctrine of collateral estoppel. Under collateral estoppel, or issue preclusion, litigants are precluded from raising issues in a subsequent action if those issues were necessary to the outcome of a prior suit between the same parties. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Collateral estoppel applies where:

(1) The issue sought to be precluded is identical to the issue involved in the prior action;

(2) The issue in the prior action was actually litigated;

(3) The issue was determined by a valid and final judgment; and

(4) The determination of the issue in the prior action was essential to the prior judgment.

*Moreno v. Schwartz*, 36 B.R. 355, 357 (Bankr.E.D.N.Y.1984); *Great American Insur. Co. v. Graziano*, 35 B.R. 589, 594–95 (Bankr.E.D.N.Y.1985).

The first criterion for collateral estoppel (the issues must be "identical") is not satisfied in the case at bar. The issues before Judge Walker concerned the interpretation of a term of the Contract between Local 6 and the Printers League, of which CPYNY was a member. Judge Walker did not consider the enforceability of the Union Option B against a member employer who is attempting to reorganize under chapter 11 of the Code. *In re Springer–Penguin, Inc.*, 74 B.R. 879, 883 (Bankr.S.D.N.Y.1989) This is the issue this Court is confronted with. The reliance by Local 6 on Judge Walker's decision is misplaced. Since the first hurdle has not been met, there is no need to go any further.

■ Having considered and ultimately rejected the collateral estoppel argument raised by Local 6, this Court must determine the enforceability of Option B against this Chapter 11 debtor, CPYNY. This issue brings to bear the longstanding conflict between federal bankruptcy law and federal arbitration policy. This Court is mindful of the strong federal policy which favors arbitration as an alternative means for resolving disputes. *Zimmerman v. Continental Airlines, Inc.*, 712 F.2d 55, 57 (3rd Cir.), *cert. denied*, 464 U.S. 1038, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984); *Demsey & Assoc., Inc. v. SS Sea Star*, 461 F.2d 1009, 1017 (2d Cir.1972). The federal arbitration policy must be considered in light of the expanded jurisdiction given to the bankruptcy court as provided in the bankruptcy Code. See 28 U.S.C. § 1471. In expanding the jurisdiction, Congress effectively "created a comprehensive framework to deal with the specialized area of bankruptcy problems intending to centralize all disputes concerning such matters in the Bankruptcy Court...." *Braniff Airways, Inc. v. United Airlines, Inc. (In re Braniff Airways, Inc.)*, 33 B.R. 33, 34 (Bankr.N.D. Tex.1983). The purpose behind the expansion of the jurisdictional powers "is to give the debtor and her creditor body a full, fair, speedy, and unhampered chance for reorganization." *Id.*

In weighing the competing federal policies, one court noted:

Bankruptcy proceedings, however, have long held a special place in the federal judicial system. Because of their importance to the smooth functioning of the nation's commercial activities, they are one of the few areas where Congress has expressly preempted state jurisdiction. While the sanctity of arbitration is a fundamental concern, it cannot be said to occupy a position of similar impor-

tance. Therefore, because of the importance of bankruptcy proceedings in general, and the need for expeditious resolution of bankruptcy matters in particular, we hold that the intentions of Congress will be better realized if the Bankruptcy Reform Act is read to impliedly modify the Arbitration Act.

*Zimmerman v. Continental Airlines, Inc.*, 712 F.2d at 59 (3rd Cir.1983); *see also, In re Springer–Penguin, Inc.*, 74 B.R. 879, 884 (Bankr.S.D.N.Y.1987); *In re Braniff Airways, Inc.*, 33 B.R. 33 (Bankr.N.D.Tex. 1983).

■ Therefore, it is within the discretion of the bankruptcy court judge to decide whether or not to compel a debtor to proceed with arbitration proceedings. *Zimmerman v. Continental Airlines, Inc.*, 712 F.2d at 59; *Double TRL, Inc. v. F.S. Leasing, Inc. (In re Double TRL, Inc.)*, 65 B.R. 993, 998 (Bankr.E.D.N.Y.1986) ("[T]he enforcement of contractual arbitration agreements is left to the sound discretion of the bankruptcy court."); *Currell v. Mazur (In re F & T Contractors)*, 649 F.2d 1229, 1232 (6th Cir.1981).

■ Local 6 also claims that the interest arbitration proceedings are not stayed because they involve other non-debtor parties. Union's Memorandum in Opposition at 11–12. Local 6 cites *Teachers Ins. & Annuity Ass'n of America v. Butler*, 803 F.2d 61 (2d Cir.1986) in support of its position but that case only supports the contention that the automatic stay applies to the debtor but not to non-debtors in a related proceeding. CPYNY correctly points out that the automatic stay applies to the interest arbitration proceedings *only* to the extent that they go forward against CPYNY, the debtor. Although arbitration proceedings are not listed in § 362 of the Code as one of the proceedings stayed, legislative history and case law make it clear that such proceedings were intended to fall within the stay provision. *In re AL–Cam Development Corp.*, 99 B.R. 573, 575 (Bankr.S.D.N.Y.1989); *In re Braniff*, 33 B.R. at 34. The legislative history specifically provides that "proceedings are stayed, *including arbitration,* administrative and judicial proceedings." S.Rep. No.

989, 95th Cong., 2d Sess. at 50 (1970) (emphasis added), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5863.

■ In determining whether or not to compel a debtor to go forward with arbitration, the courts have taken into account several factors:

1. Whether the issue can be resolved more expeditiously by the bankruptcy judge as opposed to through the arbitration process;

2. Whether or not special expertise is necessary in deciding the issue;

3. The impact on creditors of the debtor who were never parties to the agreement containing the arbitration clause;

4. Whether arbitration threatens the assets of the estate.

*In re F & T Contractors, Inc.*, 649 F.2d 1229, 1232 (6th Cir.1981); *Johnson v. England*, 356 F.2d 44, 51 (9th Cir.), *cert. denied*, 384 U.S. 961, 86 S.Ct. 1587, 16 L.Ed.2d 673 (1966); *Mor Ben–Ins. Markets Corp. v. I.R.B. (In re Mor–Ben Ins. Markets Corp.)*, 73 B.R. 644, 647 (9th Cir. BAP 1987); *In re T.D.M.A., Inc.*, 66 B.R. 992, 995 (Bankr.E.D.Pa.1986); *In re Allen & Hein, Inc.*, 59 B.R. 733, 735 (Bankr.S.D.Cal. 1986).

In the case at bar it is not clear whether going forward with interest arbitration would be more expeditious and/or economical in the long run. Although Local 6 initiated the arbitration process in June of 1989, not much has occurred to date on that front. This is probably due to the litigation in the district court over which Judge Walker presided. Therefore, if this Court were to hear and decide the issues subject to interest arbitration, there would be minimal, if any, duplication of work done by either counsel for the debtor or by counsel for Local 6. *Cf. In re Allen & Hein, Inc.*, 59 B.R. at 735 (The bankruptcy judge required debtor to proceed with arbitration because a "substantial sum of money (had) ... already been expended in the arbitration proceeding ...").

Furthermore, interest arbitration is not necessarily the most expeditious route to pursue. Parties normally agree to arbitration clauses in contracts because it is nor-

mally thought to be the most expeditious means of resolving the dispute at hand. That seems to be true only in theory in the instant case. Option B was invoked once before by Local 6 in October 1985. That interest arbitration proceeding is still pending, this is a far cry from being expeditious. These issues must be determined as soon as possible since the debtor cannot assess in total its labor costs and profits and cash flows until a new collective bargaining agreement is reached. As long as Local 6 has the upper hand and can submit unresolved issues to arbitration, it will not have an incentive to reach a collective bargaining agreement. Admittedly, Judge Walker's supplemental decision did restrict the number of issues subject to interest arbitration but the provisions pertaining to income guaranties and discharge reinstatement are still subject to interest arbitration. These issues must be settled before a new collective bargaining agreement can be reached. A drawn out arbitration proceeding will also adversely affect the debtor's ability to formulate a plan of reorganization. CPYNY must be able to assess its labor costs in order to be able to formulate a plan or reorganization. This Court declines Local 6's invitation to run the risk of frustrating the entire reorganization process in this case. See also, In re Braniff Airways, Inc., 33 B.R. at 36.

Additionally, special knowledge of labor law is not necessary to make a determination of any issue subject to the interest arbitration clause. The bankruptcy court is in as good a position, if not better, as an arbitrator to determine whether Union Local 6 members are entitled to contract enhancement and whether the debtor is in a financial position to provide said enhancements. The bankruptcy court is involved with the financial position of the debtor from day one of the filing of the bankruptcy petition. It would be a waste of the assets of the estate to require this debtor to produce the information in an interest arbitration proceeding when this Court is competent to make a determination and the information is of the type that is produced to this Court as a matter of course.

Courts have refused to force a debtor to submit to arbitration where the creditor body which has a vital interest in the debtor's estate, is not allowed to participate in the arbitration proceeding. In re F & T Contractors, Inc., 649 F.2d at 1232; In re Braniff Airways, Inc., 33 B.R. at 36. The creditors of CPYNY are not parties to the Contract and therefore to the Union Option B but Local 6 has stated that it would welcome the participation by the Creditors' Committee for CPYNY in the interest arbitration proceedings. Union's Reply Memorandum in Opposition at 12, n. 8. Even given this concession by Local 6, there still exists sufficient cause for this Court to relieve the debtor from Option B.

Finally, an arbitration award will threaten the assets of the estate. Union Option B provides Local 6 with an opportunity to receive contract enhancements but does not allow CPYNY to request reductions in the Contract. Any interest arbitration involving CPYNY, which is in financial difficulty, is a no-win situation. It was clear to this Court at the hearing for interim relief that CPYNY needs reductions in its labor costs, not an increase in those costs. Local 6 concedes that arbitration award would not be self-enforcing against CPYNY but that this Court would have to approve it. In the end, therefore, the Court will end up considering the same thing—the contract enhancements. It would be a tremendous waste of everyone's time to postpone the inevitable.

Accordingly, the debtor, CPYNY, is permanently relieved from Union Option B. All matters that would have been subject to interest arbitration, as provided in the Contract and as provided for in Judge Walker's Orders dated September 26, 1989 and January 24, 1990, will be heard and determined by this Court.

## CONCLUSION

For the foregoing reasons, CPYNY's motion seeking to be permanently relieved from Union Option B is granted.

Settle Order on five (5) days' notice.