**In re UNITED STATES LINES, INC. and United States Lines (S.A.), Inc. f/k/a Moore McCormack Lines, Inc., Debtors.**

**UNITED STATES LINES, INC. and United States Lines (S.A.), Inc. Reorganization Trust, Plaintiff,**

**Asbestosis Claimants, Plaintiff–Intervenors,**

v.

**AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION INC., West of England Owners Mutual Protection and Indemnity Association, Inc., Continental Insurance Corporation, United Kingdom Mutual Steamship Assurance Association (Bermuda) Limited, Assuranceforeningen Skuld, Liverpool & London Mutual Steamship Protection and Indemnity Association Limited, Marine Office of America Corporation, and The Travelers Insurance Company, Defendants.**

**Bankruptcy Nos. 86–B–12240, 86–B–12241. Adv. No. 93–8004A.**

United States Bankruptcy Court, S.D. New York.

July 5, 1994.

---

See also, 162 B.R. 410.

H. Benzie (Gregory J. Mayer, on the brief), Bigham Englar Jones & Houston, New York City, for Aetna Cas. and Sur. Co., CIGNA Property and Cas. Ins. Co., Great American Ins. Co., Hartford Fire Ins. Co., U.S. Fire Ins. Co. ("Fulton Survivors") and Continental Ins. Co. ("Continental").

R. Brown (James E. Pratt, on the brief), Kirlin, Campbell, Meadows & Keating, New York City, for American S.S. Owners Mut. Protection and Indem. Ass'n, Inc. ("American Club").

D. Dougherty, Kirlin, Campbell, Meadows & Keating, New York City, for Liverpool & London Mut. S.S. Protection and Indem. Associated Ltd. ("Liverpool & London").

M. Corrigan (Nicholas Even, on the brief), Simpson Thacher & Bartlett, New York City, for Travelers Ins. Co. ("Travelers").

A. Gropper, White & Case, New York City, for Creditors' Committee ("Committee").

J. Harwood and J. Kimball, Healy & Baillie, New York City, for United Kingdom Mut. S.S. Assur. Ass'n (Bermuda) Ltd. ("UK Club").

W. Hogan (Alexander F. Vitale, on the brief), Freehill, Hogan & Mahar, New York City, for West of England Ship Owners Mut. Ins. Ass'n ("West of England").

A. Kellman, The Maritime Asbestosis Legal Clinic, Detroit, MI, for Asbestosis Claimants ("Claimants").

M. Stern (Nancy J. Heller and Susan G. Wood, on the brief), Stern, Dubrow & Marcus, Maplewood, NJ, for U.S. Lines, Inc. and U.S. Lines (S.A.), Inc. Reorganization Trust ("Trust").

G. Sullivan, Lilly Sullivan Purcell Barkan & Junge, P.C., New York City, for Assuranceforeningen Skuld ("Skuld").

### Memorandum of Decision on Defendants' Motions to Dismiss and for Summary Judgment

FRANCIS G. CONRAD,* Bankruptcy Judge.

Before us[1] are summary judgment motions[2] by eight maritime insurers to dismiss the Trust's complaint on the grounds that the issues presented are, *inter alia,* nonjusticiable, noncore, inadequately pleaded, worthy of abstention, and, according to several foreign insurers, subject to mandatory arbitration. The motions will be denied in part and granted in part.

Plaintiff herein, United States Lines, Inc. and United States Lines (S.A.), Inc. Reorganization Trust ("Trust"), is Debtors' successor in interest under a personal injury claims resolution procedure established in Debtor's First Amended and Restated Joint Plan of Reorganization, dated February 23, 1989, as supplemented and amended by order dated February 6, 1990 ("Plan"). The Trust alleges breach of insurance contracts issued to the debtors, United States Lines, Inc. and United States Lines (S.A.) Inc., (collectively, "Debtors") and their successors in interest, and seeks primarily declaratory relief.

The defendants are Debtors' foreign and domestic maritime insurers ("Defendants" or "Clubs").

### Background

Debtors are engaged in the worldwide transportation of containerized freight on ocean-going vessels. Throughout their history as one of the world's largest shipping companies, Debtors employed thousands of seafarers to operate and maintain their vessels. Approximately 8000 of Debtors' former employees ("Claimants") have filed 15,000 claims alleging exposure to and injury from asbestos aboard Debtors' ships.[3] The Claimants seek damages for their injuries under the Jones Act, 46 App.U.S.C. § 688, *et seq.,* and the General Maritime Law.

During the forty-year period preceding their petition for relief, Debtors purchased insurance contracts, known as Protection and Indemnity policies ("P & I policies"), from the Clubs. Such policies generally constitute the major form of liability insurance for ocean-going vessels and protect the insured against "liability for bodily injury (including death) or property damage arising out of specified types of accidents, and ... certain unexpected vessel-related expenditures." A. Flitner & A. Brunck, *Ocean Marine Insurance,* vol. 1, 27 (2d ed. 1992). *See Dicola v. American S.S. Owners Mut. Protection and Indem. Ass'n, Inc. (In re Prudential Lines, Inc.),* 148 B.R. 730, 736–38 (Bankr.S.D.N.Y. 1992) (recounting history of P & I insurance).

The P & I policies relevant here, with minor exceptions, contain the following standard terms and conditions:

The [Club] agrees to indemnify the assured against any loss, damage or expense which the assured shall become liable to pay and shall pay by reason of the fact that the assured is the owner (or operator, manager, charterer mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel and which shall result from the following liabilities, risks, events, occurrences and expenditures:

Liability for loss of life, or personal injury to, or illness of any person.

Liability for costs, charges and expenses reasonably incurred and paid by the assured in connection with any liability insured under this policy, subject, however, to the same deduction that would be applicable under this policy to the liability de-

---

* Sitting by special designation.

1. Chief Bankruptcy Judge Lifland transferred this adversary proceeding from Bankruptcy Judge Blackshear to us on March 4, 1994, in the interest of maintaining an equitable distribution of cases.

2. Many of the defendants challenge our jurisdiction. We note that we are also obligated to define our jurisdiction under 28 U.S.C. § 157(b)(3). We do so below.

3. The health hazards associated with asbestos exposure are well documented. *See, e.g., Findley v. Blinken (In re Joint Eastern & Southern Dist. Asbestos Litigation),* 129 B.R. 710, 734–42 (E. & S.D.N.Y.1991), *vacated on other grounds,* 982 F.2d 721 (2d Cir.1992), *modified on reh'g,* 993 F.2d 7 (2d Cir.1993) (recounting history of asbestos use and cataloging diseases associated with asbestos exposure); G. Lordi & L. Reichman, *Pulmonary Complications of Asbestos Exposure,* 48 Am. Family Physician 1471 (Dec. 1993) (describing various diseases linked to asbestos exposure).

fended; provided, that if any liability is incurred and paid by the assured as aforesaid, the deduction shall be applied to the aggregate of the claim and expenses.

*See* Complaint, ¶ 12.

P & I Clubs are mutual insurance associations. In a recent English decision from the House of Lords, Lord Brandon described P & I insurance in the following manner:

> It is the long-established practice of shipowners to enter their ships in protection and indemnity associations (P & I clubs) for the purpose of insuring themselves against a wide range of risks not covered by an ordinary policy of marine insurance. By so entering one or more of their ships in a P & I club shipowners become members of that club. P & I clubs operate on a system of mutual insurance under which the successful claim of one member is paid out of the contributions of, and the calls made on, all the members including himself. Each member is accordingly both an insurer and an insured.

*Firma C–Trade S.A. v. Newcastle Protection and Indem. Assoc.,* 2 ALL E.R. 705, 708 (1990). Fewer than twenty P & I clubs exist worldwide. Most if not all Clubs are members of the International Group of Protection and Indemnity Associations, an organization where member clubs share information and intelligence and "most importantly, pool their losses and share in the purchase of reinsurance." A. Flitner & A. Brunck, supra, vol. II, 2 (2d ed. 1992). See Paulyson Cert. I ¶ 11 (American Club, UK Club, Liverpool & London, West of England, and Skuld are known members of the International Group.)

P & I policies often contain a "pay to be paid" or "pay first" provision which, in the event of a shipowner's insolvency and absent creative undertakings, may render the policies unenforceable. *See, e.g., Liman v. American S.S. Owners Mut. Protection and Indem. Assoc.,* 299 F.Supp. 106 (S.D.N.Y.), *aff'd,* 417 F.2d 627 (2d Cir.1969), *cert. denied,* 397 U.S. 936, 90 S.Ct. 946, 25 L.Ed.2d 116 (1970) (permitted insolvent P & I policy holder to borrow funds necessary to satisfy policy's pay first provision); *In re Prudential Lines, Inc., supra,* 148 B.R. at 747–50 (same).

Generally, but with some notable exceptions, a Club would insure Debtors' entire ocean-going fleet for a particular year. Pau-

lyson Cert. I, ¶ 4. Deductibles for each accident or occurrence ranged between $250 and $100,000. *See* Complaint, ¶¶ 12, 13. Policy limits also varied from year to year.

### Procedural History

Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* on November 24, 1986. Debtors' Plan was confirmed on May 16, 1989.

The Plan as amended transfers all of Debtors' maritime insurance rights to the Trust and the Reorganization Trustee ("Trustee"). *See* Plan, Art. VII(A)(1)(i) ("U.S. Lines and U.S. Lines (S.A.) will transfer to the USL Reorganization Trust ... all the insurance rights of such Debtors, including without limitation their Protection and Indemnity Coverage....") The Trustee, in turn, must collect all monies owed under applicable insurance policies. *See Id.* ("The USL Reorganization Trustee shall attempt to secure for the benefit of the holders of the Personal Injury Claims all such insurance rights and Indemnification and Contribution Rights.")

The Trustee is empowered to resolve disputed personal injury claims and to distribute Debtor's assets to personal injury claimants. *See* United States Lines, Inc. and United States Lines (S.A.), Inc. Reorganization Trust Agreement, ¶ 3.5 (the "Trust Agreement") ("The Reorganization Trustee shall be entitled ... to enforce such Insurance Rights and Indemnification and Contribution Rights and to receive and retain as Reorganization Trust Assets any payments made with respect to such rights.")

The Plan vests all Trust enforcement powers in the Trustee to collect funds owed by the Clubs:

> The Club[s] shall fund the portion of the Allowed Claim equal to the Allowed Excess P.I. Claims. *To the extent any Club shall refuse to consent to such a program, the USL Reorganization Trustee is authorized and directed to bring suit against the Club[s] and to take all reasonable steps to obtain the benefits of Insurance above the deductible and the reimbursement of defense costs exceeding the applicable de-*

ductible, including the making of cash payments of Allowed Excess P.I. Claims.

Plan, Art. VII(1)(ii) (emphasis ours). To the extent that allowed claims are not paid with proceeds from Debtors' insurance policies, including maritime P & I policies, the Plan dictates that distributions to prepetition unsecured personal injury claimants are limited to securities issued by the reorganized Debtors. *See* Plan, Art. V(B)(1), (2), Art. VII(A)(1)(i)–(iv).

On December 8, 1992, Bankruptcy Judge Blackshear "so ordered" a stipulation of conditional settlement ("Stipulation") between the Trust and a group of personal injury claimants represented by Dickstein, Shapiro & Morin ("Dickstein Claimants"). The Stipulation established a revolving cash procedure to satisfy the "pay first" provision in each of the P & I policies. None of the Clubs participated in the settlement process. After Bankruptcy Judge Blackshear approved the settlement with the Dickstein Claimants, the Trust filed this proceeding seeking a declaration of its and the Clubs' rights and obligations under the P & I policies, the Plan, and applicable law.

The Trust alleges ten counts in the Complaint, most of which seek a declaration from us concerning the Clubs' contractual requirements under the P & I policies relative to the various terms and conditions of the Stipulation. Specifically and in summary form, the Trust asks that we determine (1) whether the P & I policies are enforceable contracts, (2) what acts or occurrences trigger coverage, (3) whether the Trust may select from among the triggered P & I policies which policy the Trust wishes to pay certain claims, (4) whether the Trust must satisfy deductibles for each and every P & I policy before a given Club is obligated to indemnify the Trust for an asbestos-related loss (i.e., that deductibles need not be "stacked"), (5) whether the Trust may satisfy all deductibles with reorganization securities, (6) whether the Stipulation's escrow and "Liman" procedures satisfy the policies' "pay first" requirement, (7) whether the Clubs may offset unpaid premiums against their indemnification obligations under different, fully funded policies, (8) whether the American Club must reimburse the

Trust for funds paid to settle the Brandenburg claim, (9) whether the UK Club must reimburse the Trust for funds expended in the defense of the Ramos claim, and (10) whether the Clubs are liable for punitive damages and attorneys' fees.

On April 12, 1993, Bankruptcy Judge Blackshear granted the Claimants' motion to intervene under Fed.R.Civ.P. 24 and Fed.R.Bankr.P. 7024. As intervenors, the Claimants filed a companion complaint seeking declarations substantially similar to those sought in the Trust's Complaint.

The Clubs now move for summary judgment. As of this writing, over five years have passed since Debtors' Plan was confirmed.

## Discussion

### I. *Summary Judgment*

Fed.R.Civ.P. 56(c), applicable here under Fed.R.Bankr.P. 7056, provides that summary judgment shall be rendered if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The primary purpose in granting summary judgment is to avoid unnecessary trials where no genuine issue of material fact is in dispute. A fact is considered material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of showing that there is an absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, the evidence is considered in a light most favorable to the party opposing the motion. Similarly, all inferences to be drawn from the underlying facts must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986);

*United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Lendino v. Trans Union Credit Information Co.*, 970 F.2d 1110, 1112 (2d Cir.1992).

Our responsibility in considering a motion for summary judgment is not to resolve issues of fact but to assess whether there are factual issues to be tried. *Anderson, supra,* 477 U.S. at 248–250, 106 S.Ct. at 2509–2511; *Brown v. Health Care and Retirement Corp. of America,* 25 F.3d 90, 91–92 (2d Cir.1994); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

When a motion for summary judgment is made and supported by the movant, Fed. R.Civ.P. 56(e) requires the nonmoving party to set forth specific facts demonstrating that genuine issues of material fact remain for trial. *Matsushita, supra,* 475 U.S. at 586–87, 106 S.Ct. at 1355, 89 L.Ed.2d 538 (1986). The nonmovant must set forth the disputed facts in supporting materials, including affidavits, rather than defer to the pleadings alone. *First Nat'l Bank of Arizona v. Cities Serv. Corp.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968); *General Am. Communications Corp. v. Landsell (In re General Am. Communications Corp.),* 130 B.R. 136, 152 (S.D.N.Y.1991). We note that the Trust has not filed a cross motion for summary judgment. The merits of the Clubs' summary judgment motions are discussed below.

## II. *Declaratory Judgment Standard*

■ The Clubs argue that there are no justiciable issues before us because the Trust's complaint is premature.[4] We disagree.

■ Subject to the limits of our jurisdiction[5], we may issue a declaratory judgment[6] if a proceeding presents an actual case or controversy, or, in the words of the Supreme Court, if

the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *see Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (defining justiciable controversies); *see also Keene Corp. v. Fiorelli (In re Joint Eastern and Southern District Asbestos Litigation),* 14 F.3d 726, 731 (2d Cir.1993) (court may enter a declaratory judgment only in favor of a party who has a substantive claim of right to such relief); *see also* Fed.R.Civ.P. 57; Fed.R.Bankr.P. 7001(9). These standards are inherently fact-intensive and therefore applicable on a case-by-case basis.

■ A trial court's authority to issue a declaratory judgment is discretionary. *In re Joint Eastern and Southern Dist. Asbestos Litigation,* 993 F.2d 313, 314 (2d Cir.1993) (citation omitted). In this Circuit, a trial court

must entertain a declaratory judgment action [if] the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or [if a declaration] will terminate and afford relief from the uncer-

---

**4.** American Club, Travelers, Liverpool, UK Club, and West of England have all alleged in one form or another that the Complaint fails to state a justiciable case or controversy. Several Clubs also attack the standing of the Claimants to bring what the Clubs allege is a direct action. We discuss the standing of the Claimants under the subheading entitled "intervention," *infra.*

**5.** The Declaratory Judgments Act, 28 U.S.C. § 2201, *infra,* is remedial, not jurisdictional. *See* C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* §§ 2754, 2755 (1986 & Supp. 1994). We discuss the limits of our subject jurisdiction at some length below.

**6.** Section 2201 of Title 28 provides in pertinent part:

(a) In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a) (West Supp.1992).

tainty, insecurity, and controversy giving rise to the proceeding.

*Continental Casualty Co. v. Coastal Sav. Bank,* 977 F.2d 734, 737 (2d Cir.1992) (citation omitted) (emphasis ours). Again, if either prong is met, "the declaratory action *must be entertained." Id.* (emphasis ours).

Following our review of the Complaint and of the parties' respective positions, we find that a sufficient "case or controversy" exists to warrant exercise of our discretion to declare the rights and obligations of the parties.[7] The controversy presented in the Trust's Complaint is immediate and, indeed, obvious. The Stipulation that Bankruptcy Judge Blackshear "so ordered" in 1992 settled 106 claims asserted by the Debtors' former employees and established several procedures to satisfy the "pay first" provisions in the Debtors' P & I policies. Since that time over a year and a half ago, none of the relevant Clubs has stepped forward to reimburse the Trust according to the Stipulation's terms and procedures. As evidenced in the many papers filed in reference to these summary judgment motions, there is little if any common ground uniting the Trust and the Clubs. For example, the Clubs hotly contest whether the "Liman" and escrow procedures outlined in the Stipulation comport with the policies themselves and the law of this Circuit. Until a resolution of this and other collateral issues occurs, no money will change hands and no relief will come to the many parties involved in this proceeding.

Therefore, consistent with both factors provided in *Continental Casualty, supra,* we find that issuance of declaratory judgment pronouncing the rights and obligations of the parties will undoubtedly allay (albeit temporarily, we fear) the many coverage disputes aired in the Complaint and the Clubs' motions for summary judgment. Moreover, these disputes are of sufficient immediacy

and reality to ensure that the parties will adequately represent their respective positions for purposes of collateral estoppel and *res judicata* or, in modern parlance, preclusion. The Clubs' motion on this issue will be denied.

### III. *Jurisdiction*

■ We next address the Clubs' arguments that this proceeding is noncore under 28 U.S.C. § 157(b)(2).[8] Several Clubs also question our subject matter jurisdiction.[9]

### A. *Subject Matter Jurisdiction.*

■ Any intelligent discussion of a bankruptcy court's subject matter jurisdiction over state law contract actions must begin with *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality decision invalidating § 1471 of the Bankruptcy Reform Act of 1978). The Supreme Court opined that Bankruptcy courts have limited jurisdiction to hear state law contract actions and other proceedings involving so-called private rights, i.e., "the liability of one individual to another." *Id.,* 458 U.S. at 67–70, 102 S.Ct. at 2869–2871. *See Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 450, n. 7, 97 S.Ct. 1261, 1266, n. 7, 51 L.Ed.2d 464 (1977) (defining private rights) (citation omitted). In striking down § 1471 of the 1978 Bankruptcy Act, the Supreme Court held that Congress could not confer Article III authority over private rights to a specialized non-Article III court. *Marathon, supra,* 458 U.S. at 74, 102 U.S. at 2873. The Court wrote

the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages.... The former may

---

7. Declaratory judgments construing insurance coverage are quite common. *See, e.g., Sirius Ins. Co. (UK) Ltd. v. Collins,* 16 F.3d 34 (2d Cir.1994) (involving boating insurance); *Allstate Ins. Co. v. A.A. McNamara & Sons, Inc.,* 1 F.3d 133 (2d Cir.1993) (involving homeowner's policy); *In re Prudential Lines, supra,* 148 B.R. at 737 (involving marine P & I insurance).

8. Continental, Fulton Syndicate, Travelers, Liverpool, Skuld, UK Club, and West of England argue that this proceeding is noncore. We address the Clubs' substantive arguments collectively in our discussion.

9. American Club, Liverpool, and the UK Club argue that we lack subject matter jurisdiction over this proceeding.

well be a "public right," but the latter obviously is not.

*Id.,* 458 U.S. at 71, 102 S.Ct. at 2871.

■ Under *Marathon* and its scion, Article I courts have considerably more authority to decide disputes involving so-called public rights, i.e., cases that arise between the Government and the persons subject to its authority, than to resolve private rights issues between individuals. *See Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 51, 109 S.Ct. 2782, 2795–96, 106 L.Ed.2d 26 (1989) (defining public rights as situations where "the Government is involved in its sovereign capacity under an otherwise valid statute[.]") (footnote omitted); *see also Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 593–94, 105 S.Ct. 3325, 3337, 3339–40, 87 L.Ed.2d 409 (1985) (holding that pesticide registration is a public right); *Crowell v. Benson,* 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932) (public rights doctrine extends to matters arising "between the [g]overnment and the persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments."). Without holding on the issue, the Supreme Court assumed that the "restructuring of debtor-creditor relations" qualifies as a public right. *Granfinanciera, supra,* 492 U.S. at 56, n. 11–12, 109 S.Ct. at 2798 n. 11–12.

■ In *Thomas, supra,* the Supreme Court summarized its holding in *Marathon* in the following manner: "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." *Thomas,* 473 U.S. at 584, 105 S.Ct. at 3334. More important, the Court stated that Article I courts could resolve private disputes that were closely related to or substantively entangled with regulatory and governmental interests. "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Id.,* 473 U.S. at 593–94, 105 S.Ct. at 3339–40. *See Germain v. Connecticut Nat'l Bank,* 988 F.2d 1323, 1331 (2d Cir.1993) (noting that public rights doctrine may apply to private rights that are inextricably intertwined with public rights). Assuming that the restructuring of debtor-creditor relations is a public right, then presumably a bankruptcy court, despite its Article I limitations, could resolve a state law breach of contract action against a stranger to the bankruptcy case if the contract action is inseparably and inextricably intertwined with the restructuring of debtor-creditor rights.[10]

In the post-*Marathon* era, title 28 § 1334 defines the tripartite grant of subject matter jurisdiction in bankruptcy cases and proceedings.[11] First, in response to the constitutional concerns penned by the plurality in *Marathon, supra,* § 1334(a) vests "original and exclusive jurisdiction" over bankruptcy cases in the district court. Second, under 28 U.S.C. § 1334(d), district courts have "exclusive jurisdiction" over all the debtor's property "wherever located." And third, in "all civil proceedings arising under title 11, or arising in or related to cases under title 11," district courts exercise "original but not exclusive jurisdiction." 28 U.S.C. § 1334(b).

District courts may refer all cases arising under title 11 and all proceedings related to or arising in a case under title 11 to the bankruptcy judges in their district. 28 U.S.C. § 157(a). All district courts have adopted general orders referring cases under title 11 to their respective bankruptcy courts. See, e.g., Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, July 10, 1984 (Ward, Acting C.J.).

Subject matter jurisdiction under § 1334(b) is considered expansive in scope.

---

10. We note that many state court judges not appointed for life and with terms shorter than our own routinely adjudicate contract actions.

11. *See generally* A. Ostrow, *Constitutionality of Core Jurisdiction,* 68 Am.Bankr.L.J. 91 (1994) (discussing bankruptcy court jurisdiction).

*Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 114 (2d Cir.1992). Following referral to the bankruptcy court under 28 U.S.C. § 157(a), core and noncore matters are subsumed within the court's subject matter jurisdiction. A. Ostrow, *supra,* 68 Am.Bankr.L.J. at 114 n. 178.

The threshold determination for bankruptcy court subject matter jurisdiction is whether the proceeding is "related to" the case under title 11. Disputes within "arising in" or "arising under" jurisdiction are, *a fortiori,* within "related to" jurisdiction. Courts apply a liberal standard to determine whether a proceeding is related to a bankruptcy case. *See, e.g., In re Cuyahoga Equip. Corp., supra,* 980 F.2d at 114 ("[t]he test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether its outcome might have a 'conceivable effect' on the bankruptcy estate."); *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984) ("[t]he usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."). After a finding that a proceeding is related to a case, courts then address the core issue under 28 U.S.C. § 157(b)(2). *See Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.),* 152 B.R. 667, 671–672 & n. 6 ("[u]ltimately, once there is a determination that the matter is 'related to' the bankruptcy case, the bankruptcy court has subject matter jurisdiction and the inquiry immediately proceeds to the question of whether the matter is core.") (citations omitted).

Before addressing the merits of the arguments advanced by the individual Clubs concerning our subject matter jurisdiction over this proceeding, we note that of all the Clubs, only the American Club filed a proof of claim against the Debtors for unpaid premiums and assessments.[12] This voluntary act alone defeats the American Club's arguments disputing our subject matter jurisdiction.

"It is well settled that by filing a proof of claim in a bankruptcy case, a creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting the filing creditor to the bankruptcy court's equitable jurisdiction." *In re Best Products Co., Inc.,* 168 B.R. 35, 67 (S.D.N.Y.1994) (Brozman, J.), citing e.g., *Langencamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990); *Granfinanciera, supra,* 492 U.S. at 58–59 & n. 14, 109 S.Ct. at 2798–2799 & n. 14, 106 L.Ed.2d 26 (1989); *First Fidelity Bank, N.A., New Jersey v. Hooker Invs., Inc. (In re Hooker Invs., Inc.),* 937 F.2d 833, 838 (2d Cir.1991). If a creditor files a proof of claim and is then sued by a debtor-in-possession or trustee, then that action becomes part of the claims allowance process, which is triable only in equity. *Langenkamp, supra,* 498 U.S. at 44, 111 S.Ct. at 331 (citation omitted). See *Travellers Int'l AG. v. Robinson,* 982 F.2d 96, 98, 100 n. 5 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1946, 123 L.Ed.2d 651 (1993) (holding that the filing of a claim waives the right to jury trial and an Article III judge.) We therefore have subject matter jurisdiction over the Trust's action against the American Club.

Our subject matter jurisdiction over the remaining seven Defendants requires only a brief analysis.

We begin with the Plan itself. The Trust is a significant component of Debtor's ongoing reorganization. The Plan unequivocally provides for the retention of the bankruptcy court's exclusive jurisdiction to decide essentially all "controversies and disputes regarding the interpretation or enforcement of the terms of the Plan [and] the [Trust.]" and "the adjudication of any causes of action ... under the Bankruptcy Code ... brought by ... the [Trust.] Plan, Art. XIII, ¶¶ D, G.

"[A] bankruptcy court retains post-confirmation jurisdiction in a chapter 11 proceeding only to the extent provided in the plan of reorganization." *Hospital and Univ. Property Damage Claimants v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 7 F.3d 32, 34 (2d Cir.1993). Despite this broad statement and the sweeping retention provi-

---

12. See Paulyson Cert. II, Ex. M.

sions listed in Article XIII of the Plan, a bankruptcy court obviously cannot expand its subject matter jurisdiction beyond the jurisdictional grant provided in 28 U.S.C. § 1334. *Portfolio Lease Funding Corp., No. 1 v. Seagate Technology, Inc. (In re Atlantic Computer Sys., Inc.)*, 163 B.R. 704, 707 (Bankr. S.D.N.Y.1994). It is also clear, in light of the language quoted above, that the Court retains all subject matter jurisdiction to the extent that it exists. *See* Plan, Art. XIII, ¶¶ D, G.

After considering all the parties' arguments and the cases cited above, we find that this proceeding is at least related to the Debtors' case and therefore within our subject matter jurisdiction under 28 U.S.C. § 1334(b). *See, e.g., In re Cuyahoga Equip. Corp., supra*, 980 F.2d at 114. The Trust's declaratory action is fundamental to the distribution of the estate's property and its allocation among the various Claimants. Moreover, the Trust's obligations under the Plan clearly relate to the Debtors' case and reorganization because the P & I policies are property of the Debtors' estate and, by way of the Plan and Confirmation Order, constitute the res of a disbursement trust. Our jurisdiction over property of the estate is, of course, beyond reproach under 28 U.S.C. § 1334(d) and numerous court decisions. *See, e.g., MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 91 (2d Cir.), *cert. denied*, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) ("It is well established that a bankruptcy court has jurisdiction over all of the property of the debtor's estate, wherever located.") (citations omitted).

## B. *Core Jurisdiction.*

Having found subject matter jurisdiction, we next address the Clubs' contention that this proceeding is noncore.

■■■ Core proceedings include all proceedings integral to the restructuring of debtor-creditor rights, whether or not they involve questions of state law, and all proceedings in which the right to relief is created by title 11 of the United States Code. According to one well-respected commentator, "the only types of proceedings which are excluded from core treatment are those

which arise out of causes of action owned by the debtor at the time the title 11 case is filed and those between third parties related to the bankruptcy estate." 1 L. King, *Collier on Bankruptcy* ¶ 3.01 at 3–49 & n. 95 (15th ed. 1994). Neither of these exclusions exists herein.

Relying on the recent Second Circuit decision, *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures, Inc.)*, 4 F.3d 1095 (2d Cir.1993), *cert. dismissed*, —— U.S. ——, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994), the Clubs argue that bankruptcy courts, with their limited Article I grant from Congress, cannot issue final orders in any dispute arising from a prepetition contract. We note that the issue presented here— whether a postpetition, postconfirmation breach of a prepetition insurance contract is a core matter—has not been resolved in light of recent Second Circuit decisions that may restrict our ability to decide state law contract actions.

The Trust argues that the Complaint raises core issues under § 157(b)(2)(A), (B), and (O) because (1) the Trust is a direct product of the Debtors' chapter 11 case; (2) the Plan retained bankruptcy court jurisdiction to resolve all disputes involving the Trust; (3) the P & I policies are property of the estate; and (4) the alleged breach of contract occurred postpetition during implementation of the Plan.

The jurisdiction of the bankruptcy court over core proceedings is set forth in 28 U.S.C. § 157(b)(1):

> [b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section and may enter appropriate orders and judgments.

*Id.* The phrases "arising in" and "arising under" are terms of art. See 57 H.R.Rep. No. 95–595, 95th Cong., 2nd Sess., 445–446 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6400–6401 (discussing "arising under" jurisdiction); 1 L. King *Collier on Bankruptcy* ¶ 3.01 at 3–32 (15th ed. 1994) (discussing matters within "arising in" jurisdiction).

The bankruptcy courts may enter final orders in core proceedings. In contrast, any determinations by the bankruptcy court in a related noncore proceeding, upon timely objection, are subject to *de novo* review by the district court. 28 U.S.C. § 157(c)(1); *Ben Cooper, Inc. v. Insurance Co. of the State of Pa. (In re Ben Cooper, Inc.)* 896 F.2d 1394, 1397–1398 (2d Cir.), *vacated and remanded on other grounds*, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *reinstated on remand*, 924 F.2d 36 (2d Cir.), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991). Numerous courts and commentators have analyzed the origins, applications, and limits of core jurisdiction. For the sake of brevity, we do not repeat their holdings here.

Section 157(b)(2) of title 28 classifies certain matters as core proceedings. The list is nonexclusive. Two of this section's catchall subsections are relevant here. Under § 157(b)(2)(A), "matters concerning the administration of the estate" are core. And under § 157(b)(2)(O), "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or equity security holder relationship, except personal injury tort or wrongful death claims" are also core.[13]

Despite their broad implications, "matters concerning the administration of the estate" and "proceedings affecting the liquidation of the assets of the estate" are construed in light of *Marathon's* jurisdictional limitations. *Ben Cooper, supra*, 896 F.2d at 1398. Our Circuit has defined these jurisdictional and constitutional limits in several decisions.

Most recently, in *Orion, supra*, 4 F.3d at 1102, the Second Circuit held, *inter alia*, that the bankruptcy court lacked core jurisdiction over a prepetition contract dispute where the defendant had not filed a proof of claim.[14] The Court cautioned that § 157(b)(2)(A) should not be construed so broadly as to "swallow the rule" announced in *Marathon. Id.*, 4 F.3d at 1102. Unlike the facts asserted in the Trust's Complaint, however, *Orion* involved an alleged prepetition breach of con-

---

**13.** The Trust also raises § 157(b)(2)(B) as supporting core jurisdiction. In response, the Clubs argue that the proceeding involves personal injury claims over which we have no jurisdiction. The Clubs' concerns are, however, misdirected.

Clearly, this proceeding is a declaratory judgment action against the Debtors' prepetition insurers seeking resolution of certain coverage disputes, not a proceeding for the estimation or liquidation of personal injury claims. "[Although] [t]he cases are clear that a bankruptcy court may not hear proceedings to liquidate or estimate personal injury tort or wrongful death claims for the purpose of determining the distribution payable to such claimants[,] the estimation of such claims by a bankruptcy court for other purposes, such as determining the feasibility of the debtor's plan of reorganization, is permissible and [may constitute] a 'core' proceeding." *In re Chateaugay Corp.*, 111 B.R. 67, 72 (Bankr.S.D.N.Y.1990), *aff'd in relevant part*, 146 B.R. 339 (S.D.N.Y.1992) (citations omitted); *see also Roberts v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 45 B.R. 823, 825–826 (S.D.N.Y.1984) (estimation of personal injury claims for purposes other than distribution are within core jurisdiction.)

**14.** *Orion* also held that it was error for the bankruptcy court to decide a disputed factual issue in the context of determining whether the debtor could assume an executory contract. *Id.*, 4 F.3d at 1098–1099 ("At heart, a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues.") This aspect of *Orion* is inconsistent with actual practice and restricts the bankruptcy courts' ability to decide factual issues in motions to assume executory contracts. *Compare, e.g., Hart Envtl. Management Corp. v. Sanshoe Worldwide Corp. (In re Sanshoe Worldwide Corp.)*, 993 F.2d 300, 305 (2d Cir.1993) (finding that bankruptcy courts must make "specific findings" before approving assumption or rejection of contract); *In re National Sugar Refining Co.*, 21 B.R. 196, 198 (Bankr.S.D.N.Y.1982) (holding that 11 U.S.C. § 365 authorized bankruptcy courts to resolve questions involving the validity of contracts.) If the *Sanshoe* fits, wear it.

*Orion* also ignores Fed.R.Bankr.P. 6006 and 9014, which provide that motions to assume executory contracts are contested matters in which many of the Part VII adversary proceeding rules apply, including the right to engage in full discovery. A. Kornberg & E. Schuchardt, *Jurisdiction of the Bankruptcy Courts and Procedural Matters*, Am.Bankr.Inst., Fourth Annual Bankruptcy Battleground, Current Developments Panel, 4–7 (Feb. 23, 1994) (seminar materials). The ability to develop facts in a contested matter strongly suggests the authority to resolve those facts in the same proceeding. S. Shimshak & S. Esbin, *Motions to Assume: Court Invites Delays and Debtor Risk*, The Bankruptcy Strategist, Jan. 1994, at 5.

tract, rather than a postpetition breach. *Orion* is therefore distinguishable from the issue before us in at least that respect.

An earlier Second Circuit decision, *Ben Cooper, supra,* 896 F.2d at 1400, held that state law contract actions are within the bankruptcy court's core jurisdiction under 28 U.S.C. § 157(b)(2)(A) ("matters concerning administration of the estate") when the contract was entered into postpetition. *Id.* ("the adjudication of such claims is an essential part of administering the estate.") The Court expressly limited Marathon to claims arising prepetition and declined to apply the rule to claims involving contracts entered into postpetition. *Id.* at 1400.

Ben Cooper involved a commercial insurance policy that the debtor obtained postpetition. Following a fire at one of the debtor's facilities, the insurer denied coverage and alleged that the debtor misrepresented and omitted material information in the policy application.

Quoting extensively from First Circuit Chief Judge Breyer's decision in *Arnold Print Works, Inc. v. Apkin (In re Arnold Print Works, Inc.),* 815 F.2d 165, 168 (1st Cir.1987), and employing "the traditional tools of statutory construction," the Second Circuit wrote that bankruptcy jurisdiction "was to be construed as broadly as possible within the constitutional constraints of *Marathon.*" *Ben Cooper,* 896 F.2d at 1398. The Court noted that certain facts were particularly persuasive in its finding that core jurisdiction existed over postpetition contract actions under 157 U.S.C. § 157(b)(2)(A). Again citing *Arnold Print Works,* the Court observed that trustees and debtors-in-possession are officers of the bankruptcy court, and that postpetition contracts with a debtor-in-possession are "integral" to estate administration. *Ben Cooper, supra,* 896 F.2d at 1399. Moreover, the Court wrote that the insured building was property of the estate and that plan confirmation was premised, at least in part, on adequate insurance. *Id.* (citations omitted).

The Second Circuit emphasized the postpetition timing of the alleged cause of action in support of its conclusion that a bankruptcy court has core jurisdiction over certain post-petition state law contract actions. *See Id.,* 896 F.2d at 1400 ("the timing of a dispute may render it uniquely a bankruptcy case."); see also *Kenston Management Co., Inc. v. Lisa Realty Co. (In re Kenston Management Co., Inc.),* 137 B.R. 100, 105 (Bankr.E.D.N.Y. 1992) ("the point at which a claim arises is a critical element in determining whether a proceeding is core or noncore.") (citing *Ben Cooper*). The Second Circuit interpreted *Marathon* as applying "to claims arising prepetition" and declined to apply *Marathon's* holding to claims involving contracts entered into postpetition. *Ben Cooper, supra,* 896 F.2d at 1400. *Contra, Beard v. Braunstein,* 914 F.2d 434, 443–445 (3rd Cir.1990) (distinguishing both *Ben Cooper* and *Arnold Print* in a matter involving both prepetition and postpetition breach of a prepetition rental contract).

*Ben Cooper* is noteworthy in at least one other respect. Following its holding that actions concerning postpetition contracts are core, the Second Circuit specifically declined to follow two decisions from the Fifth and Ninth Circuits which narrowly construed the so-called catchall provisions in 28 U.S.C. § 157(b)(2)(A) and (O). *See Piombo Corp. v. Castlerock Properties (In re Castlerock Properties),* 781 F.2d 159, 162 (9th Cir.1986) ("state law contract claims that do not specifically fall within the categories of core proceedings enumerated in 28 U.S.C. § 157(b)(2)(B) [through] (N) are related proceedings under § 157(c) even if they arguably fit within the literal wording of the two catch-all provision [in] § 157(b)(2)(A) and (O)."); *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir.1987) ("a proceeding is core under [§] 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") The Court preferred to read the general provision in § 157(b)(2) in such a manner as not to render them null. *Ben Cooper,* 896 F.2d at 1400.

The facts alleged by the Trust are chronologically somewhere between those at issue in *Orion* and in *Ben Cooper.* Here, the Trust alleges postpetition breach of insurance policies entered into prepetition. *Ben Cooper's* broad interpretation of core juris-

diction under § 157(b)(2)(A), however, lends strong support to the Trust's position that the issues before us are core.

After *Ben Cooper*, the Second Circuit issued a decision on facts analogous to those alleged in the Trust's Complaint. In *St. Clare's Hosp. and Health Center v. Insurance Co. of N. Am., (In re St. Clare's Hosp. and Health Center)*, 934 F.2d 15 (2d Cir. 1991), the Court of Appeals affirmed verbatim Chief Bankruptcy Judge Lifland's decision holding that the debtor's postpetition, postconfirmation suit to enforce a debtor's rights under a prepetition insurance policy was a core proceeding. There, the chapter 11 debtor-hospital sought a declaration that its insurer was obligated to defend and indemnify it under a prepetition insurance policy in a medical malpractice action filed over two years after confirmation of the plan of reorganization.

The chronology of events in *St. Clare's* is significant. The hospital filed its chapter 11 petition in 1982 and a plan of reorganization was confirmed approximately a year later. The plan provided for the "retention of jurisdiction by the United States Bankruptcy Court for the Southern District of New York of all matters pertaining to the execution of the Plan, including the settlement of, and/or objection to claims." *Id.*, 934 F.2d at 17. On June 28, 1985, over two years after confirmation, an individual commenced suit in state court against the hospital alleging personal injuries arising from medical malpractice that occurred in 1967. Soon thereafter, the hospital notified the underwriter that had insured it against professional liability during 1967. The hospital then commenced an adversary proceeding in the bankruptcy court seeking a declaration that its insurer was obligated to defend and indemnify. The Second Circuit Court of Appeals, overturning the District Court, affirmed the opinion of Chief Bankruptcy Judge Lifland and held that the hospital's declaratory action to enforce its rights under a prepetition insurance policy was a core proceeding under 28 U.S.C. § 157(b)(2). *Id.* at 18–19.

In support of core jurisdiction, Chief Bankruptcy Judge Lifland cited a number of cases where a chapter 11 debtor's rights under its insurance policies are property of the debtor's estate under § 541(a) of the Bankruptcy Code. *Id.*, 934 F.2d at 19–19, *citing, e.g., Johns–Manville Corp. v. Asbestos Litigation Group (In re Johns–Manville Corp.)*, 26 B.R. 420, 436 (Bankr.S.D.N.Y.1983), *aff'd*, 40 B.R. 219, 230 (S.D.N.Y.1984), *aff'd sub nom., MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 92 (2d Cir.1988), *cert. denied*, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988). More recent decisions reach a similar conclusion. *See, e.g., First Fidelity Bank v. McAteer*, 985 F.2d 114, 116–117 (3d Cir. 1993) ("This Court has held that insurance policies are property of the estate 'even though the policy has not matured, has no cash surrender value and is otherwise contingent.'") (citation omitted); *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55 (5th Cir.1993) ("courts are generally in agreement that an insurance policy will be considered property of the estate.") (footnote and citations omitted). Moreover, prior to the Second Circuit's ruling in *Johns–Manville, supra*, 837 F.2d at 92, courts in at least four other circuits have held that insurance coverage is property of the bankruptcy estate. *National Union Fire Ins. Co. v. Titan Energy, Inc. (In re Titan Energy, Inc.)*, 837 F.2d 325 (8th Cir.1988); *Tringali v. Hathaway Mach. Co.*, 796 F.2d 553 (1st Cir.1986); *A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.)*, 788 F.2d 994 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *Minoco Group of Cos., Ltd. v. First State Underwriters Agency of New England Reins. Corp. (In re Minoco Group of Cos., Ltd.)*, 799 F.2d 517 (9th Cir. 1986).

Indeed, a number of courts have held that postpetition breach of contract actions are core proceedings because they concern the administration of the estate. District Judge Cabranes' decision in *Caplan v. Liberty Mut. Ins. Co. (In re Century Brass Prods., Inc.)*, 1992 WL 22191 (D.Conn.1992) is a good example. There, following confirmation of a reorganization plan, the plan administrator sued the debtor's general liability insurers for their postpetition refusal to pay on policies that the debtor had purchased prepetition. The underlying facts concerned an ad-

ministrative order issued to the debtor prior to confirmation. Compliance with the administrative order resulted in expenses and losses for the bankruptcy estate, which the plan administrator sought to recover from the debtor's insurers. The insurers argued that the proceeding was noncore.

District Judge Cabranes adopted the holding in a Pennsylvania case, *Valley Forge Plaza Assocs. v. Fireman's Fund Ins. Co.*, 107 B.R. 514, 517–518 (E.D.Pa.1989), and held that a postpetition breach of contract claim on a prepetition insurance policy is a core proceeding. *Century Brass, supra,* 1992 WL 22191 at *2. We reached a similar conclusion in *General Am. Communications Corp. v. Landsell (In re General Am. Communications Corp.),* 130 B.R. 136, 155–156 (S.D.N.Y.1991) (adopting our recommendation that postpetition breach of prepetition contract gave rise to core jurisdiction under 28 U.S.C. § 157(b)(2)(A)).

■ In light of the above decisions, there is no doubt as a matter of law that the P & I policies are property of the estate following the entry of the order for relief. And there is also no doubt, and we so hold, that the policies continue to exist as property of the estate despite confirmation of the Debtors' plan of reorganization and the transfer of the policies to a disbursement trust. Our reasons for so holding are factual and, indeed,

unique to the resolution of mass toxic tort claims in chapter 11 reorganizations. As in *Johns–Manville* [15], *A.H. Robins* [16], and to a lesser extent, *Prudential Lines* [17], the negotiation and liquidation of countless personal injury claims would have delayed confirmation of a plan for years—at the expense of other creditors and general policy goals favoring prompt corporate rehabilitation.[18]

Again, the unique facts of this proceeding play a key role in our holdings. Asbestos-related diseases are insidious and late-manifesting, thereby necessitating the existence and maintenance of a claims allowance process to compensate individuals whose injuries manifest anywhere from ten to forty years following initial exposure. Here, the Plan created the Trust to manage the special administrative concerns inherent in any chapter 11 case involving a large number of insidious personal injury claims.

In *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.),* 152 B.R. 667 (Bankr.M.D.Fla. 1993), a proceeding that factually parallels the one now before us, Bankruptcy Judge Baynes held that core jurisdiction existed to decide a debtor's declaratory judgment action against its prepetition insurer. The decision is, in large part, grounded on findings that the relevant policies were property of the estate and essential to the debtor's reorganization—facts that, according to the court,

**15.** Johns–Manville Corp., once the world's largest producer of asbestos, is perhaps the seminal bankruptcy case involving toxic tort claims. *See, e.g., MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 837 F.2d 89, 93 (2d Cir.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) (insurance policies are "inseparable" from the claims base and well within the bankruptcy court's jurisdiction over the debtor's assets.) Manville's factual twists and procedural turns read like a history of bankruptcy law and are well beyond the scope of this discussion. *See, most recently, Hospital & Univ. Property Damage Claimants v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 7 F.3d 32 (2d Cir.1993).

**16.** A.H. Robins Company was forced into bankruptcy after claimants filed thousands of personal injury actions related to Robins's manufacture of the Dalkon Shield contraceptive. In *A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (4th Cir.1986), the debtor sought, *inter alia,* a declaration that its liability insurance policy was an asset of the estate "in which all Dalkon shield plaintiffs and

claimants had an interest" and an injunction against all non-bankruptcy court actions with respect to the relevant insurance, particularly against nondebtor defendants. *Id.,* 788 F.2d at 997. The Fourth Circuit Court of Appeals adopted the view expressed in *Johns–Manville* and centralized all insurance proceedings. *Id.* at 1001, quoting *In re Johns–Manville Corp., supra,* 40 B.R. at 229 (insurance policies constitute "the most important asset of [the debtor's] estate.")

**17.** Prudential Lines, Inc. filed for bankruptcy in 1986. To facilitate confirmation, Prudential Lines's plan of reorganization created a disbursement trust to pay allowed asbestos-related personal injury claims asserted by the debtor's former employees. *See In re Prudential Lines, Inc., supra,* 148 B.R. 730. No distributions have yet been made, in large part because of legal foot-dragging by the parties involved.

**18.** Tobacco companies may be next to seek chapter 11 protection. *Tobacco Giants May Turn to Bankruptcy, Experts Say,* L.A. Times, June 1, 1994, at D2, col. 3.

triggered the court's core jurisdiction over a Congressionally created public right. The court distinguished collection actions, which it viewed as noncore, from proceedings seeking declaratory relief. In actions pertaining to property of the estate, the court concluded that a presumption exists that declaratory proceedings are core. *Id.*, 152 B.R. at 673 n. 9 & 674. ("where the action brought in a [c]hapter 11 case by the debtor-in-possession is a declaration of rights and not a mere state contract action, then the presumption of core continues.") We generally agree.

As in *Celotex*, we find that the Debtors' insurance policies are property of the estate earmarked for distribution to a major class of claimants. The Debtors' P & I policies are essential to the integrity of the Trust and to the Debtors' ability to reorganize. The strong nexus that exists between the Trust's adversary proceeding and the general reorganizational process renders this declaratory action core under 28 U.S.C. § 157(b)(2)(A) and (O). Summary judgment for the Clubs will be denied.

## IV. *Coverage Trigger*

As noted earlier, the Trust has not moved for summary judgment on any of the counts alleged in the Complaint. At least one declaration sought in the Complaint, however, raises only legal issues and, we find, is ripe for disposition sua sponte pursuant to Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) ("district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence.") (citations omitted); *LTV Corp. v. AM General Corp. (In re Chateaugay)*, 154 B.R. 843, 852 (Bankr.S.D.N.Y.1993) ("Where there are no disputed issues of material fact and the nonmoving party is entitled to judgment as a matter of law, a court may *sua sponte* enter judgment against a party moving for summary judgment.") (citations omitted). The Trust, as a nonmovant, will have ten days from the entry of an order to file objections to summary judgment. *See generally* 10A C. Wright, A. Miller & M. Kane,

*Federal Practice and Procedure* § 2720, 27–28 (1983 & 1994 Supp.).

Count 8, in part, seeks a declaration that the following three events trigger coverage under the applicable P & I policies: (1) exposure to asbestos; (2) "exposure-in-residence" or "continuous trigger," i.e., the cumulative period following initial exposure during which asbestos-related disease progresses; and (3) manifestation of asbestos-related disease. *See* Complaint at ¶ 82. All three examples reflect the variety of analyses employed to determine when coverage arises in asbestos litigation. *See, e.g., Commercial Union Ins. Co. v. Sepco Corp.*, 765 F.2d 1543 (11th Cir.1985) (asbestos exposure triggers coverage); *Eagle–Picher Indus. v. Liberty Mut. Ins. Co.*, 682 F.2d 12 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983) (manifestation of disease triggers coverage); and *Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) (inhalation exposure, exposure in residence and manifestation all trigger insurance coverage).

In *Prudential Lines, supra*, 148 B.R. at 742, we confronted the trigger issue and concluded that New York law applies an "injury-in-fact" trigger:

> [W]e find that federal courts applying New York law adopt the "injury-in-fact" theory as triggering coverage under a CGL policy. *See Maryland Casualty Co. v. W.R. Grace & Co.*, 794 F.Supp. 1206 (S.D.N.Y. 1991) (and cases cited therein). The injury-in-fact theory was first advanced in *American Home Products Corp. v. Liberty Mut. Ins. Co.*, 565 F.Supp. 1485 (S.D.N.Y. 1983), *aff'd as modified*, 748 F.2d 760 (2d Cir.1984) ("*AHP*"). In *AHP*, Judge Sofaer held that actual injury during the relevant policy period triggers coverage under New York law. In other words, at the time an injury actually occurs, the applicable policy is, in effect, triggered. It is of no consequence whether the injury has been discovered or not. According to *AHP*, "a real but undiscovered injury, proved in retrospect to have existed at the relevant time, would establish coverage, irrespective of the time the injury became

[diagnosable]." *AHP*, 748 F.2d at 766 (quoting *AHP*, 565 F.Supp. 1485, 1497 (S.D.N.Y.1983)). *Applying the above standard to P & I policies, we hold that injury-in-fact during the policy period triggers coverage.*

(emphasis added)

State and federal decisions issued after Prudential Lines have buttressed our conclusion there. For example, the New York Court of Appeals recently wrote "Federal courts have concluded that the 'injury-in-fact' rule is most consistent with New York law." *Continental Casualty Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 650–1, 609 N.E.2d 506, 511, 593 N.Y.S.2d 966, 971 (1993). We therefore grant summary judgment and hold that injury-in-fact during applicable policy years triggers coverage under the Debtors'

P & I policies. The factual issue of when injury-in-fact occurs remains in dispute.[19]

## V. *Arbitration*

■■■ Four foreign Clubs object to the Complaint on the grounds that their rules require arbitration of all disputes between individual Clubs and member shipowners.[20] The Clubs cite to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA")[21], and recent Supreme Court decisions in support of their positions. In response, the Trust argues that fragmented foreign arbitrations will disrupt implementation of the Plan and delay the claims resolution process.

The relevant arbitration provisions are similar in many respects. All require that any dispute under the Club's rules be submitted to arbitration under English law.[22]

---

**19.** The parties in *Prudential Lines* stipulated that exposure to asbestos causes injury. *See In re Prudential Lines, Inc., supra,* 148 B.R. at 740. The Trust and the Clubs here have not so stipulated.

**20.** Liverpool & London, the UK Club, West of England, and Skuld argue that the Trust is bound by applicable arbitration agreements. *See* Answer of Liverpool & London to Adversary Complaint, ¶¶ 10, 13, 44, Affirmative Defenses IV, VIII, XIV, XVI, XVII, XVIII, XX; UK Club Answer to Adversary Complaint ¶ 53; West of England Answer to Complaint ¶¶ 53, 57, 82, Ninth Affirmative Defense. *See also* West of England Motion, Ex. A at ¶ 3. SKULD moves for arbitration limited to "the purview of its protection and indemnity insurance coverage during the period February 20, 1978 and January 1, 1979" and alleges that its rules for the 1978–79 year incorporate those of Liverpool & London.

**21.** The FAA provides in relevant part as follows:
§ 2. Validity, irrevocability, and enforcement of agreements to arbitrate ...
A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
§ 3. Stay of proceedings where issue therein referable to arbitration
If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in

writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

**22.** Liverpool & London's rules state in pertinent part:

If and whenever any difference or dispute between the Association and any member touching any loss, claim, or contribution, such difference or dispute shall be referred to the decision of an arbitrator to be appointed by the parties in difference, or, if they cannot agree, to be appointed by the President for the time being of the Law Society of England. The provisions of the Arbitrations Acts for the time being in force shall apply to any such arbitration....
No member shall be entitled to maintain any action or other proceedings against the Association in respect of any loss or claim unless and until the claim shall have been submitted to the Directors, and they shall have given their decision thereon, or shall have made default for one month in so doing, and if such decision be disputed or such default be made unless and until the claim shall have been referred to arbitration in [the] manner herein provided, and the arbitrator shall have made his award thereon, and then only for the sum so ascertained to be payable by the Association.
Motion of Liverpool & London to Dismiss or Stay, ¶ 11a, Ex. A (rules 88, 89). Skuld uses the same contractual language. For other relevant arbitration clauses, see West of England Notice

With respect to at least one key issue raised in the Trust's Complaint, we note that English law differs substantially from precedent in this Circuit. *Compare Firma C–Trade S.A. v. Newcastle Protection and Indemnity Assoc.*, 2 ALL E.R. 705 (1990) (holding that insolvent shipowner could not recover under P & I policies) with *Liman v. American S.S. Owners Mut. Protection and Indem. Assoc.*, 299 F.Supp. 106 (S.D.N.Y.), *aff'd*, 417 F.2d 627 (2d Cir.1969), *cert. denied*, 397 U.S. 936, 90 S.Ct. 946, 25 L.Ed.2d 116 (1970) (permitted insolvent shipowner to borrow funds necessary to satisfy policy's pay first provision).

▪ The FAA provides that written arbitration agreements, like any contract, are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA establishes a federal policy favoring rigorous enforcement of arbitration agreements, "absent a countervailing policy manifested in another federal statute." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985). "The party opposing arbitration carries the burden of showing that Congress intended in a separate statute to preclude a waiver of judicial remedies, or that such a waiver of judicial remedies inherently conflicts with the underlying purposes of the other statute." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 483, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989), *citing*, *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226–227, 107 S.Ct. 2332, 2337–2338, 96 L.Ed.2d 185 (1987).

▪ Under the standards promulgated in *Rodriguez* and *McMahon*, the Trust bears the burden of showing that the relevant arbitration provisions are unenforceable either as a matter of contract law or as matter of Congressional policy. In an attempt to meet its burden, the Trust asserts that piecemeal arbitration would nullify certain fundamental policies expressed in the Bankruptcy Code and that we should therefore exercise our discretion to maintain jurisdiction over the Complaint. The Clubs argue, *inter alia*, that

the FAA has particular force and weight in international commercial disputes and that we should uphold the arbitration agreements to preserve confidence in commercial agreements abroad. We discuss the arguments of the parties in more detail below.

Numerous courts have found that the FAA irreconcilably conflicts with the Bankruptcy Code. For example, in *Zimmerman v. Continental Airlines, Inc.*, 712 F.2d 55, 59 (3d Cir.1983), *cert. denied*, 464 U.S. 1038, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984), the Third Circuit held that "the intentions of Congress will be better realized if the Bankruptcy Reform Act is read to impliedly modify the [FAA]." *Accord, In re Chas. P. Young Co.*, 111 B.R. 410, 416–418 (Bankr.S.D.N.Y.1990); *In re Springer–Penguin, Inc.*, 74 B.R. 879, 884 (Bankr.S.D.N.Y.1987). Citing the broad jurisdictional grant in the Bankruptcy Reform Act of 1978, *Zimmerman* held that "the power to stay bankruptcy proceedings pending arbitration ... is left to the sound discretion of the bankruptcy court." *Zimmerman*, *supra*, 712 F.2d at 59–60. *See Bousa Inc. v. Oy (In re Bousa Inc.)*, 1993 WL 78019, *2 (S.D.N.Y.1993) (bankruptcy court has discretion to deny arbitration); *In re Chas. P. Young Co.*, *supra*, 111 B.R. at 417 ("[I]t is within the discretion of the bankruptcy court judge to decide whether or not to compel a debtor to proceed with arbitration proceedings."); *In re Al–Cam Dev. Corp.*, 99 B.R. 573, 578 (Bankr.S.D.N.Y.1989) (bankruptcy court may exercise discretion to deny enforcement of arbitration clause).

*Zimmerman*'s application in noncore cases, however, has been limited by recent decisions in both the Third Circuit and our own. For example, following *Rodriguez*, *supra*, and *McMahon*, *supra*, the Third Circuit retreated from its holding in *Zimmerman* and held that where an adversary proceeding is not core, a district court is without discretion to deny enforcement of an arbitration agreement when the party opposing arbitration has not shown that the text, legislative history, or purpose of the Bankruptcy Code conflicts with arbitration. *Hays & Co. v.*

of Motion, Ex. C; and UK Club Motion for Summary Judgment, Hamilton Aff. ¶ 5(c), Ex. 1 & 2.

Some of the policies also contain a New York suable clause.

*Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1157–1161 (3d Cir.1989). With few exceptions, bankruptcy courts in the Second Circuit have followed the *Hays* decision in noncore proceedings. *Non–Ferrous Metals (U.S.A.), Inc. v. Vantage Steel Corp. (In re Vantage Steel Corp.),* 125 B.R. 880, 886 (Bankr.S.D.N.Y.1990); *In re Drexel Burnham Lambert Group, Inc.,* 113 B.R. 830, 838 n. 8 (Bankr.S.D.N.Y.1990). *See generally* Neufeld, *Enforcement of Contractual Arbitration Agreements under the Bankruptcy Code,* 65 Am.Bankr.L.J. 525 (1991).

*Hays* does not hold similar sway in core proceedings. Several courts have held that upon a showing that arbitration would disrupt the many policies expressed in the Bankruptcy Code, a bankruptcy judge may exercise his or her sound discretion to determine whether arbitration agreements should be enforced in core proceedings. *See, e.g., In re Chorus Data Systems, Inc.,* 122 B.R. 845, 851 n. 6 (Bankr.D.N.H.1990) (noting that *Hays* applies only to noncore proceedings); *In re FRG,* 115 B.R. 72, 75 (E.D.Pa.1990) (advocating case-by-case balancing of hardships in core proceedings). *See also American Freight Sys., Inc. v. Consumer Prods. Assocs. (In re American Freight Sys., Inc.),* 164 B.R. 341, 347 (D.Kan.1994) (agreeing with *FRG*); *After Six, Inc. v. Corestates Bank, N.A. (In re After Six, Inc.),* 1993 WL 224737 at *3 (Bankr.E.D.Pa.1993), *aff'd sub nom. After Six, Inc. v. Abraham Zion Corp.,* 1994 WL 125219 (E.D.Pa.1994) (holding deferral to arbitration within court's discretion in core and noncore proceedings).

■ We have already held that this adversary proceeding is core under 28 U.S.C. § 157(b)(2)(A) & (O) and therefore distinguishable from *Hays* on its face. In light of the above decisions, we hold that a bankruptcy judge may exercise his or her discretion in core proceedings if the standards articulated in *McMahon, supra,* 482 U.S. at 226–227, 107 S.Ct. at 2337–2338, are satisfied. Thus, a party contesting arbitration must show either (1) that the arbitration clause is unenforceable as a matter of contract law or (2) that Congress, in enacting the Bankruptcy Code, intended to preclude a waiver of judicial remedies, or that such a waiver of judicial remedies would inherently conflict with the underlying purposes of the Code.

The Trust does not contest the general contractual validity of the arbitration agreements. Instead, the Trust argues that following factors weigh against compelling arbitration: (1) the P & I policies are critical to the administration of the Debtors' Plan and Trust; (2) the Complaint alleges wrongdoing that makes it anything but a "garden-variety" contract dispute; (3) the vast number of asbestos-related claims requires centralized case management; and (4) fragmented arbitrations would undermine the Debtors' confirmed Plan. Trust Brief at 78–79. The Trust also cites numerous Code sections that support its general policy argument that arbitration would disrupt implementation of the plan. *See, e.g.,* 11 U.S.C. §§ 1123(a)(5) and 1142(a) (defining court's power to implement plan); Trust's Brief at 21–28, 78–81.

The Clubs emphasize the international character of the agreements in their motion to compel arbitration. For example, the UK Club argues that strict adherence to the FAA will foster confidence in the international commercial system. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 629, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985) (concluding that the needs of the foreign commercial system require enforcement of the parties' agreement, notwithstanding a contrary result under domestic law) (citation omitted). The Clubs also cite bankruptcy court authority upholding foreign arbitration agreements. *See, e.g., Unsecured Creditors' Committee of Dollar Corp. v. Hyundai Motor Co. (In re Dollar Corp.),* 139 B.R. 192, 193 (Bankr.E.D.Mich. 1992) (finding no conflict between FAA and Bankruptcy Code when liquidated debtor is party to foreign arbitration agreement).

We agree with the Clubs that *Rodriguez, McMahon,* and *Mitsubishi* add renewed vigor to the FAA and that some decisions have limited judicial discretion to invalidate otherwise enforceable arbitration agreements in bankruptcy cases. The vast majority of these cases, however, do not involve core proceedings where fundamental bankruptcy principles are at issue.

We find the Trust's arguments more compelling. The power to appoint a trustee for the purpose of collecting property of the debtor to satisfy a class of claims is essential to a bankruptcy court's ability to implement a plan of reorganization. *In re Johns–Manville Corp.*, 97 B.R. 174, 180 (Bankr.S.D.N.Y. 1989); *see* 11 U.S.C. § 1142(b) ("The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.") *See also* Fed.R.Bankr.P. 3020(d) ("Notwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate.") Clearly, the Clubs' alleged refusal to honor prepetition insurance policies endangers the Debtors' ability to resolve, by way of the Trust, the vast number of personal injury claims filed against it because, as we have said before, the P & I policies are the Trust's primary asset. Without the Clubs' good faith participation, Debtors will be unable to implement the Plan's procedures designed to allocate portions of the Debtor's property to individual claimants. Moreover, arbitration of the disputes raised in the Complaint would prejudice the Trust's efforts to preserve the Trust as a means to compensate claimants. We will therefore exercise our discretion and deny arbitration.

## VI. *Adequacy of Pleadings*

We next address the Clubs' motions to dismiss certain portions of the Complaint alleging common law fraud, conspiracy, and violations of New York Insurance Law § 2601 and New York General Business Law § 349.

Fed.R.Civ.Pro. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy the pleading requirement in Rule 9(b), the time, place, and nature of the misrepresentation must be set forth so that the defendant's intent to defraud is evident in the complaint. *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.

1990). The complaint should, nevertheless, be read generously in light of Fed.R.Civ.P. 8(a) which requires plaintiffs to plead only a short, plain statement of the grounds upon which they are entitled to relief. *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 n. 20 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

The Trust alleges that the Clubs, both individually and in concert, fraudulently refused to adjust, settle, and pay asbestos-related claims filed against the Debtors and the Trust. Complaint at ¶¶ 92, 93. The Trust also alleges that the Clubs misrepresented the scope and coverage of the P & I policies and that the Clubs have conspired to undermine the Trust's ability to fulfill its obligations under the Plan. *Id.* at ¶ 93.

Despite the liberal pleading rules cited above, a plaintiff must plead specific facts that, when read in their entirety, satisfy the elements of common law fraud. *See, e.g., Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) (fraud allegations must specify the time, place, speaker and content of the misrepresentation) (citations omitted); *Pereira v. Centel Corp. (In re Argo Communications Corp.)*, 134 B.R. 776, 791–793 (Bankr. S.D.N.Y.1991) (listing elements of common law fraud and discussing general pleading requirements). The Complaint fails to meet these minimal standards, in large part, we believe, because the Trust uses the word "fraudulently" in general terms to describe what is alleged to be the Clubs' wrongful refusal to adjust and settle asbestos-related claims. *See* Complaint at ¶ 93. Nevertheless, the Complaint lacks the factual support and specificity to satisfy Rule 9(b). Moreover, the Complaint fails to disclose the nature of each Club's participation in the alleged fraud. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987) ("where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his [or her] participation in the fraud.") The Trust may, of course, amend the Complaint to correct its insufficiencies.

The Clubs also move to dismiss the Trust's claim under New York Insurance Law § 2601 because the Trust fails to allege facts

showing malice or criminal indifference. Moreover, the Clubs argue that there is no private cause of action under § 2601. In the Complaint the Trust alleges that the Clubs customarily adjust and settle garden-variety personal injury claims while refusing to settle asbestos-related claims. Complaint at ¶¶ 86–91.

New York Insurance Law § 2601 provides that "[n]o insurer doing business in [New York] shall engage in unfair claim settlement practices." N.Y.Insurance Law § 2601 (McKinney Supp.1994). Unfair business practices, by definition, must be committed "without just cause" and "with such frequency as to indicate a general business practice[.]" Id. Acknowledging a split among the lower courts, the New York Court of Appeals has recently held that New York law does not currently recognize a private cause of action under § 2601. Rocanova v. Equitable Life Assurance Soc'y of the United States, 83 N.Y.2d 603, 612 N.Y.S.2d 339, 343, 634 N.E.2d 940, 944 (1994) (citations omitted).[23] The Trust's reference to § 2601 is therefore dismissed.

■ The Clubs also object to the Trust's claim under New York General Business Law § 349(a). The Clubs argue that § 349 is a consumer fraud protection statute inapplicable to disputes among sophisticated corporate entities. We disagree.

Section 349(a) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." New York General Business Law § 349(a) (McKinney Supp.1994).

The statute is enforceable by both the attorney general and any person injured by a deceptive act committed by a business. Id. at §§ 349(b), 349(h). The statute contains no exceptions and no exemptions applicable to other regulated industries. The Second Circuit has held that § 349 applies to every business operating in New York, including insurance companies. Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 52 (2d Cir.1992).

We find little merit in the Clubs' assertion that a corporate entity cannot assert a claim under § 349. Rather, most courts have held that § 349 applies when one business sues another business if the plaintiff-business acted as a consumer of the defendant-business's products or services. See, e.g., Schroders, Inc. v. Hogan Sys., Inc., 137 Misc.2d 738, 742, 522 N.Y.S.2d 404, 406 (N.Y.Sup.Ct.1987) (holding that corporate consumer has standing to assert a claim under § 349); Sulner v. General Accident Fire and Life Assurance. Corp., Ltd., 122 Misc.2d 597, 599–600, 471 N.Y.S.2d 794, 796–797 (N.Y.Sup.Ct.1984) (holding that § 349(h) allows businesses to bring actions against other businesses) (citations omitted). See also Official Supplementary Practice Commentaries to General Business Law §§ 349–350, reprinted at 19 McKinney § 349, 131 (McKinney Supp.1994). As a consumer of marine insurance, the Trust in entitled to invoke the protections and remedies provided in § 349. We therefore hold that the broad remedial nature of § 349 encompasses an action by a business consumer of insurance, even when that consumer is a corporation of obvious sophistication.[24] Lastly, several Clubs move to dismiss

---

**23.** We note that the Second Circuit reached a different conclusion in Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47 (2d Cir.1992), certified questions withdrawn, 984 F.2d 69 (2d Cir.1993). Riordan was decided before the New York Court of Appeals resolved the issue of private rights of action under § 2601. See Rocanova, supra. In applying New York law, we adhere to the following guidelines voiced by the Supreme Court:

[T]he State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving "proper regard" to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court.

Commissioner of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967), quoting Bernhardt v. Polygraphic Co. of Am., Inc., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

**24.** A case cited by the Clubs, Genesco Entertainment, A Div. of Lymutt Indus., Inc. v. Koch, 593 F.Supp. 743 (S.D.N.Y.1984), does not refute our holding. In Genesco, the district court stated that § 349 does not apply to "[a] breach of a private contract affecting no one but the parties to the contract, whether that breach be negligent or intentional, [because the conduct] is not an act or practice affecting the public interest." Id., 593 F.Supp. at 751–752. We find it obvious that a nexus exists between the Trust and the public

counts 9 (punitive damages) and 10 (attorneys' fees) of the Complaint on the grounds that both counts fail to allege separate causes of action under New York law. The Clubs also argue that punitive damages are inappropriate in maritime proceedings involving alleged breach of contract. We review both state and federal law to arrive at the conclusion below.

■■■ New York does not recognize a separate cause of action for punitive damages. *Lovebright Diamond Co., Inc. v. Spragins*, 574 F.Supp. 76, 80 (S.D.N.Y.1983); *In re Argo Communications, supra*, 134 B.R. at 796; *Green v. Fischbein Olivieri Rozenhold & Badillo*, 119 A.D.2d 345, 507 N.Y.S.2d 148, 153 (1st Dep't 1986). Nonetheless, we need not dismiss a claim alleging punitive damages because "such a claim constitutes merely an element of the total damages claimed on the underlying cause of action." *Green, supra*, 507 N.Y.S.2d at 153; *Argo, supra*, 134 B.R. at 796-7 (citations omitted). If the Trust proves at trial that the Clubs acted with moral turpitude demonstrative of a pattern of wanton dishonesty toward the public as a whole, then punitive damages may be warranted.

■■■ The Clubs' second objection necessitates a lengthier analysis. Federal choice of law rules applicable in admiralty cases provide that in the absence of an established federal maritime rule, state law governs the interpretation and construction of maritime insurance contracts. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313, 75 S.Ct. 368, 370, 99 L.Ed. 337 (1955); *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 414 (2d Cir. 1990). As we stated in *In re Prudential Lines, Inc., supra*, 148 B.R. at 738, P & I policies are maritime contracts.

The terms and conditions of P & I policies do not provide for the allowance or disallowance of punitive damages. Under *Wilburn Boat, supra*, we must determine whether federal law allows the award of punitive damages under facts similar to those alleged in the Complaint and, to the extent that state and federal common law may differ, which law prevails.

■■■ Under federal common law, punitive damage awards are generally improper in a maritime breach of contract action unless the conduct constituting the breach is also a tort for which punitive damages are recoverable. *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63 (2d Cir.1985) (citing Restatement (Second) of Contracts § 355 (1979)); *See G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F.Supp. 895, 913 (S.D.N.Y.1994) (applying same rule in nonmaritime context).

■■■ Notwithstanding this general prohibition, the Second Circuit has noted a number of exceptions to the rule, including actions based on the bad faith refusal of an insurer to settle an insurance claim for which it is liable. *Thyssen, supra*, 777 F.2d at 63 (citations omitted). While there appear to be no maritime cases discussing punitive damages in breach of contract actions, federal courts have held that punitive damages are available in nonmaritime breach of contract actions involving an insurer's bad faith or outrageous conduct. *Id.* at 62 n. 5 (noting "new body of case law" awarding punitive damages against insurance companies on the basis of outrageous conduct in the handling of claims) (citations omitted). We see no reason why a similarly strict standard should not govern maritime cases.

■■■ Fortunately, we need not decide whether state or federal law sustains an award of punitive damages because both sovereigns apply a similar standard.[25] New

interest. As we stated earlier, the Trust was created to collect funds owed under the Debtors' insurance policies for ultimate distribution to thousands of asbestos-related personal injury claimants. According to the Complaint, many of the claimants endure serious physical illnesses and require costly medical care. Many others have died. The public certainly has an interest in seeing that those who have contracted and accepted payment to ensure against such losses

should also bear the resulting financial burden of coverage if appropriate.

**25.** Although neither the Trust nor the Clubs specifically address the choice of law issue, we assume that New York law applies in the absence of controlling federal law. *See, e.g., State Trading Corp. of India, Ltd., supra*, 921 F.2d at 414 & 416–17 (stating choice of law standards) (citations omitted). The Clubs argue that federal

York law, much like the federal rule announced in *Thyssen, supra,* 777 F.2d at 63, dictates a strict standard for the issuance of punitive damages. *See, e.g., Walker v. Sheldon,* 10 N.Y.2d 401, 405, 179 N.E.2d 497, 499, 223 N.Y.S.2d 488, 491 (1961) (holding that only gross and wanton conduct against the public can support an award of punitive damages.) In breach of contract actions, punitive damages are recoverable in New York as long as the underlying tort evinces a high degree of moral turpitude that demonstrates a pattern of wanton dishonesty toward the public as a whole. *Rocanova, supra,* 83 N.Y.2d 603, 612 N.Y.S.2d 339, 634 N.E.2d 940 (citations omitted).

■ In a nutshell, the Trust alleges that the Clubs have participated in a global conspiracy to deny coverage to shipowners whose employees claim asbestos-related injuries. From our reading of the alleged facts, we conclude that the Trust alleges facts of outrageous conduct and conspiracy that, if proven at trial, could support the award of punitive damages.

The Complaint also alleges facts that, at a minimum, state a claim for tortious bad faith by an insurer. *See, e.g., Pavia v. State Farm Mut. Automobile Ins. Co.,* 82 N.Y.2d 445, 626 N.E.2d 24, 605 N.Y.S.2d 208 (1993) (describing prima facie case of bad faith against insurer). In New York, "a bad-faith plaintiff must establish that the defendant insurer's conduct constituted a gross disregard of the insured's interests when considering a settlement offer." *Id.,* 82 N.Y.2d at 453, 626 N.E.2d at 27, 605 N.Y.S.2d at 211 (quotation and citation omitted). The Trust asserts that the Clubs willfully conspired to avoid satisfying their contractual obligations to settle and adjust claims and that the Clubs routinely treat asbestos-related claims differently from other personal injury claims. *See, e.g.,* Complaint ¶¶ 92, 93 ("The Clubs have acted, both individually and in concert, to wrongfully refuse to adjust, settle and pay for any and all asbestos-related claims made against the

Trust or the debtor.") Assuming as we must that uncontroverted facts alleged in the Complaint are true, it is at least possible that a reasonable fact finder could conclude that the Clubs' actions amount to bad faith or even outrageous conduct. Material facts, of course, remain in dispute.[26]

In light of the above, the Trust's Complaint is deemed to demand punitive damages if evidence at trial supports an award. The Clubs' motion to dismiss Count 9 of the Complaint is denied as a matter of law.

■ We also deny the Clubs' motion to dismiss Count 10. State law creates the substantive right to attorney's fees. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50–54, 111 S.Ct. 2123, 2136–2137, 115 L.Ed.2d 27 (1991); *Riordan v. Nationwide Mut. Fire Ins. Co., supra,* 977 F.2d at 53. In New York,

> the law is well settled that in the absence of a statute expressly authorizing [him or her] to do so, or unless the parties have otherwise agreed or stipulated, a civil litigant may neither sue [his or her] adversary to recover fees paid to [his or her] attorney for legal services, nor, unless the court has directed taxation of such a payment in extraordinary circumstances, tax them as a disbursement.

*Donn v. Sowers,* 103 A.D.2d 734, 735, 477 N.Y.S.2d 197, 198 (2d Dep't 1984) (citation omitted); *see also, Fresh Meadows Medical Assoc. v. Liberty Mut. Ins. Co.,* 65 A.D.2d 431, 434, 411 N.Y.S.2d 655, 657 (2d Dep't 1978), *rev'd on other grounds,* 49 N.Y.2d 93, 400 N.E.2d 303, 424 N.Y.S.2d 361 (1979) ("A litigant has no inherent right to have his [or her] attorney's fees paid by his [or her] opponent ... except if specifically provided by contract or statute.") (citations omitted).

Count 10 explicitly falls within the contractual exception to the general rule barring attorney's fees as a separate cause of action. The Trust alleges that the relevant P & I policies provide for attorneys fees as part of the "costs, charges and expenses reasonably

---

maritime law preempts state law to the extent that federal rules exist—a statement with which we agree. The Clubs do not assert, however, which state's laws would apply in the absence of a federal rule.

**26.** For example, the UK Club states that is has consistently negotiated settlements in good faith with the Trustee. Hamilton Aff., ¶ 4, sworn April 7, 1994.

incurred and paid by the assured in connection with any liability insured under this policy," subject to applicable deductibles. See Complaint, ¶ 98 (quoting P & I policy). Count 10 therefore states a claim for attorney's fees recognized under New York law. Whether another construction of the above contractual terms may be appropriate under the circumstances will be resolved at trial.

## VII. *Intervenors' Complaint*

 The Clubs also move to dismiss the Claimants' Complaint on the grounds that the Claimants, as intervenors, lack standing under New York's direct action statute.[27] We disagree.

Fed.R.Civ.P. 24 provides for both mandatory and permissive intervention. Rule 24 provides in pertinent part:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

By order dated April 6, 1993, Bankruptcy Judge Blackshear granted the Claimants' motion to intervene without indicating whether the intervention was "of right" or "permis-sive." Seizing upon this perceived ambiguity, the Clubs maintain that the Claimants are, at best, permissive intervenors who cannot participate absent independent grounds for federal jurisdiction. The Clubs also contend that the Claimants lack standing to sue under New York Insurance Law §§ 3420(i), 2117(b)(3)(B) and 1113(a)(21), all of which purportedly bar direct actions against marine P & I clubs. We reject both contentions.

At a minimum, Bankruptcy Judge Blackshear found that the nature and extent of the Claimants' interests warranted permissive intervention under Rule 24(b). *See, e.g., United States Postal Serv. v. Brennan,* 579 F.2d 188, 191 (2d Cir.1978) ("Permissive intervention is wholly discretionary with the trial court.") Whether Bankruptcy Judge Blackshear could have found intervention "of right" requires a lengthier review.

Rule 24(a)(2) gives any applicant a right to intervene if (1) the applicant establishes a sufficient interest in the proceedings and (2) that interest is not "adequately represented by existing parties." *See* 7C C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1901 *et seq.* (1986 & Supp.1994).

The Clubs do not contend that the Claimants' interests in this proceeding are insufficient or insignificant.[28] Instead, the Clubs argue that the Claimants' interests are adequately represented by the Trust.

Although counsel for the Trust is certainly competent and diligent in representing the Trust, it cannot be said that the Trust and the Claimants share identical incentives. For example, in its answer to the Intervenors' Complaint, the Trust requests that the Claimants provide certain information verifying individual injuries. The Claimants may, given the dynamics of this mass toxic tort setting, advocate less stringent factual burdens and verification procedures to lower costs and maximize distributions. Moreover,

---

27. The Clubs' other objections to the Intervenors' complaint have been considered elsewhere in our discussions relative to the Trust. Except as noted, the causes of action in the Intervenors' complaint are subject to the same infirmities and strengths applicable to the causes of action alleged in the Trust's Complaint. A settled order should cover both complaints.

28. The Claimants' interest in this proceeding is, indeed, obvious. The subjects of the Trust's Complaint are the Debtors' prepetition P & I policies. These policies constitute the sole property of the Trust, which in turn constitutes the major source of any distribution for the Claimants.

we have no doubt that the Claimants, as intervenors, will assist in the full development of the underlying factual issues raised by the Trust, as well as contribute to the just and equitable adjudication of this proceeding.

The Clubs' standing argument also fails.[29] The reasons for our denial rest in both state and federal law.

Federal admiralty law neither authorizes nor forecloses a third party's right to sue an insurance company directly. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld,* 921 F.2d 409, 414 (2d Cir. 1990). Assuming that New York provides the appropriate law, *see* note 19, *supra,* the Clubs assert that New York Insurance Law § 3420 prohibits the Claimants from commencing a direct action against them and that the Claimants' complaint fails to state an independent cause of action under applicable state law.

New York Insurance Law § 3420 permits an insured's judgment creditors, i.e., third party claimants, to bring suit against the insured's liability insurer directly.

> [A]ny person who, or the personal representative of any person who, has obtained a judgment against the insured or his personal representative, for damages for injury sustained or loss or damage occasioned during the life of the policy or contract[.]

N.Y.Ins. Law § 3420(b)(1) (McKinney Supp. 1994). This section generally applies to insurance policies that underwrite "liability for injury to person." N.Y.Ins. Law § 3420(a) (McKinney Supp.1994). Several exceptions, however, disallow certain direct actions by third parties.

One exception to § 3420 is relevant here. Citing other sections of the New York Insurance Law, courts have generally held that third parties cannot bring direct actions against maritime insurers. *See* N.Y.Ins.

Law §§ 2117(b)(3), 3420(i) (McKinney Supp. 1994) (exempting marine insurers from state licensing requirements); *Ahmed v. American S.S. Owners Mut. Protection & Indem. Ass'n, Inc.,* 444 F.Supp. 569 (N.D.Cal.1978), *aff'd,* 640 F.2d 993 (9th Cir.1981) (holding P & I policies are excluded from New York's direct action statute), *accord, Miller v. American S.S. Owners Mut. Protection & Indem. Co.,* 509 F.Supp. 1047 (S.D.N.Y.1981); *Cowan v. Continental Ins. Co.,* 86 A.D.2d 646, 446 N.Y.S.2d 412 (2d Dep't 1982). Citing these authorities and others, the Clubs argue that the Claimants have no cause of action under New York law and therefore no standing to intervene in this proceeding.

An abundance of case law, however, refutes the Clubs' position. Under Fed. R.Civ.P. 24(a), an intervenor "of right" does not need the standing necessary to commence a suit so long as an actual case or controversy exists between the initial, ongoing litigants. *United States Postal Serv. v. Brennan,* 579 F.2d 188, 190 (2d Cir.1978), *citing, e.g., Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 536–539, 92 S.Ct. 630, 635–636, 30 L.Ed.2d 686 (1972); *see Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 375 n. 18, 98 S.Ct. 2396, 2404 n. 18, 57 L.Ed.2d 274 (1978) (finding that court possessed ancillary jurisdiction to entertain intervenor's claim despite absence of subject matter jurisdiction); 7C C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1917 (1986 & Supp.1994) (stating as general rule that intervenors of right need not have independent jurisdiction.) *but see Diamond v. Charles,* 476 U.S. 54, 68, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986) (noting that Supreme Court has not determined whether a party seeking to intervene under Rule 24(a)(2) must also meet the requirements of Article III standing).

In our discussion above, we held that a sufficient case or controversy exists to support consideration of the Trust's declaratory

---

**29.** "[T]he question of standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies.'" *Association of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 828, 25 L.Ed.2d 184 (1970); *see also Sierra Club v. Morton,* 405 U.S. 727, 732,

92 S.Ct. 1361, 1364–1365, 31 L.Ed.2d 636 (1972) ("standing depends on whether the party has alleged such a 'personal stake in the outcome of the controversy' as to ensure that the 'dispute sought to be adjudicated will be presented in an adversarial context....'") (citations omitted).

judgment action. See Discussion, I, supra. As intervenors of right, the Claimants may stand on the Trust's broad shoulders for purposes of this core proceeding—notwithstanding their alleged lack of standing under § 3420. The Clubs' invitation to dismiss the intervenors' complaint for lack of independent standing will be denied.[30]

Moreover, we are disinclined to follow courts that have enforced New York's direct action statute against injured third parties in maritime cases. See, e.g., Miller, supra, 509 F.Supp. 1047 (holding New York's direct action statute inapplicable in maritime cases). A more compelling view, we believe, rests in the broad remedial purpose of the Jones Act, 46 App.U.S.C. § 688, a federal statute that arguably preempts New York's attempts to limit the liability of maritime insurers. See R. Alexander, Admiralty, Federalism, and the New York Direct Action Statute: Seamen's Rights to Enforce Jones Act Judgments, 49 Brook.L.Rev. 179 (1983) (New York law barring direct actions against maritime insurers conflicts with federal admiralty power and Jones Act.) This reading, we believe, is not inconsistent with the narrow holding in Wilburn Boat, supra, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337, concerning state authority to regulate maritime insurance. See R. Alexander, supra, 49 Brook. L.Rev. at 201–206 (construing Wilburn Boat narrowly according to its facts). Although we do not hold on the issue, we note that "the judiciary has traditionally taken the lead in formulating flexible and fair remedies in the law of maritime." McDermott, Inc. v. AmClyde, —— U.S. ——, ——, 114 S.Ct. 1461, 1465, 128 L.Ed.2d 148 (1994), quoting, United States v. Reliable Transfer Co., 421 U.S. 397, 409, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

As a final aside, we note that the Clubs generally raised thought-provoking arguments supporting dismissal of the Complaint. The arguments were sometimes poor or simply undeveloped, however, thereby requiring us to engage in extensive independent research that substantially delayed issuance of this decision. Further complicating our deci-sion-making role, precious few of the parties' briefs included tables of contents and lists of authorities—small inconveniences that become significant in a ten-party, multi-count, dispute. Given what we have witnessed, we can only speculate that the parties, either all or some, see little benefit in a speedy resolution of the issues presented. We will not allow this proceeding to advance at a snail's pace in the future.

## VIII. Conclusions

1. The Trust's declaratory judgment action raises justiciable issues. Summary judgment for the Clubs will be denied.

2. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (O). The Clubs' motions for abstention will be denied.

3. Injury-in-fact during the policy term triggers insurance coverage. Summary judgment will be granted sua sponte.

4. We may exercise our discretion to deny arbitration in core proceedings. Summary judgment for the Clubs will be denied.

5. The Complaint fails to allege common law fraud with sufficient particularity. The fraud allegation will be dismissed with leave to replead.

6. There is no private right of action under New York Insurance Law § 2601. This count will be dismissed.

7. The Complaint states a claim under New York General Business Law § 349. The Clubs motions for dismissal and summary judgment will be denied.

8. The Complaint states a claim for punitive damages. The Clubs' motions for dismissal or summary judgment will be denied.

9. The Complaint states a claim for attorney's fees. The Clubs' motions for dismissal or summary judgment will be denied.

10. As intervenors of right, the Claimants need not assert independent standing to join this core proceeding. The Clubs' motion to

---

**30.** We add that the Intervenors' Complaint will not be burdensome on the Clubs because the issues raised therein mirror those articulated in the Trust's Complaint.

dismiss the Claimants' Complaint will be denied.